KING, Justice,
for the Court:
¶ 1. Charlotte and Larry Wilson, parents of Crystal Wilson (deceased), filed an action requesting visitation with their grandchildren. The chancellor granted the request. Aggrieved, Stephen Smith, Crystal’s former husband, and Melissa LuAnn Smith, Stephen’s current wife, appeal the chancellor’s decision and challenge the constitutionality of Mississippi’s grandparent-visitation statutes. The Smiths raise four issues on appeal:
I. Whether sections 93 — 16—3—(1) and 93-16-5 and Martin v. Coop[1] are unconstitutional in light of Troxel v. Granville.[2]
II. Whether Mississippi Code sections 93-16-3(1) and 93-16-5, the Martin factors, and the elements set forth by the United States Supreme Court in Troxel violate the Smiths’ due process rights.
III. Whether the chancellor erred in applying the Martin factors.
IV. Whether the chancellor granted excessive grandparent visitation.
¶ 2. We hold the following: (I) Mississippi’s grandparent-visitation statute and the Martin factors do not violate the Constitution. (II) The chancellor did not err in applying the grandparent-visitation statutes, the Martin factors, and Troxel to this case. (Ill) The chancellor properly applied the Martin factors. (IV) And the Wilsons’ visitation is not excessive. Thus, we affirm the chancellor’s judgment.
FACTS AND PROCEDURAL HISTORY
¶ 3. Crystal Wilson married Stephen Brian Smith in December 2001. Two children were born of the marriage: Breely, born June 23, 2002, and Banks, born Au *54 gust 28, 2006. In January 2007, Stephen secured employment with the Boeing Company, which prompted a family move to Ohio. Tragically, Crystal died in a car accident later that month. Stephen immediately moved his family to Hamilton, Mississippi, where they lived with Crystal’s parents, Charlotte and Larry Wilson.
¶ 4. Stephen lived with the Wilsons a few months before moving back into the family home in Columbus, Mississippi. Stephen let Breely and Banks live with the Wilsons for two and a half years. During this time, Stephen obtained a college degree from the Mississippi University of Women, where he met Melissa Luann Smith, whom he married October 31, 2008.
¶ 5. The Smiths desired to move the children into the family home and expressed this desire to the Wilsons on several occasions. According to Stephen, Charlotte would object, become upset, and cry. Thus, the Smiths let the children finish the school year living at the Wilsons’ home. The Smiths moved the children to their home in July 2009, and the children continued to visit the Wilsons on most weekends.
¶ 6. According to Stephen, his relationship with the Wilsons became strained in the fall of 2009. But the Wilsons could think of no events which would have strained their relationship at that time. Stephen testified that the Wilsons would not enforce his house rules-no eating in the bedroom, children must brush their teeth at certain times, no running and screaming inside, and children must respect adults. Linda Smith, Stephen’s mother, testified that the children were also hyper and disobedient after staying with the Wilsons. Additionally, Stephen complained that the Wilsons openly had criticized him in front of the children, and Charlotte had questioned his choice of school for Breely. But Charlotte did not voice her opinion to Stephen; Linda had informed Stephen of Charlotte’s dissatisfaction many months later. Believing the Wilsons were undermining his parenting, the Smiths decreased the Wilsons’ visitation with Breely and Banks in the spring of 2010.
¶ 7. The tension between the Smiths and the Wilsons came to a head during Easter weekend in April 2010. The children spent the weekend with the Wilsons. As Charlotte was bathing Banks, she noticed a bruise on his left thigh.[3] Charlotte questioned Breely about the bruise, and she informed Charlotte that Stephen had given Banks sixteen licks with a belt. Larry attempted to take Banks to a clinic, but it was closed. The receptionist instructed Larry to take Banks to the Sheriffs Department. He did, and the Sheriffs Department contacted the Department of Human Services (DHS). From there, DHS launched an investigation into Banks’s alleged abuse. Stephen admitted spanking Banks but denied bruising him. No formal action resulted from the investigation.
¶ 8. Upset by this series of events, the Smiths denied the Wilsons further visitation with Breely and Banks. The Wilsons then filed a complaint for visitation in the Lowndes County Chancery Court on June 7, 2010.[4] The Smiths confronted the Wil-sons about the complaint. Stephen admitted telling Larry he would give him a “terrible ass whooping.” And according to Charlotte, Melissa threatened her via text *55 and voice-mail messages.[5] Melissa also assaulted Charlotte.
¶ 9. In July 2010, the Smiths moved to Illinois. When asked why they had moved, Stephen stated the move was for employment opportunities.[6] But the Wil-sons testified that the Smiths had moved in retaliation to their complaint.[7] Since the move, the Smiths have not allowed the Wilsons any contact with the children.
¶ 10. Stephen stated he is entitled to decide what is best for his children. And he believes visitation with the Wilsons would be emotionally detrimental to Breely and Banks. Since ending visitation with the Wilsons, Stephen stated his children are now well-adjusted and happy. Stephen would not state specifically when he thought it would be fit to resume visitation and indicated that he “might” abide by a court order.[8] Charlotte stated visitation would be beneficial to the children, because they are the only connection the children have to their mother Crystal.
¶ 11. Because the children’s mother is deceased, the chancellor found the Wilsons were entitled to visitation under Mississippi Code Section 98-16-3(1). See Miss. Code Ann. § 93-16-8(1) (Rev.2004). The chancellor also considered the factors for grandparent visitation established in Martin v. Coop, 693 So.2d 912 (Miss.1997) and found that: (1) The distance between the families is great, but the Wilsons requested visitation only during holidays, spring break, and summer. Although the Wil-sons allowed the children more freedom, there was no proof that grandparent visitation would be disruptive. (2) The suitability of the Wilsons’ home was not contested. (3) The age of the children did not favor either party. (4) The Wilsons’ ages and physical and mental health were not an issue. (5) After caring for the children for two-and-half years, the Wilsons had developed a special bond with the children. (6) The Wilsons’ moral fitness was not an issue. (7) The Wilsons and the Smiths lived eight hours apart; thus, the distance favored the Smiths. (8) With the exception of the Easter incident, the Wilsons accepted their nonparental role. The Smiths could not point to a specific occurrence in which the Wilsons had interfered with their discipline. (9) The Wilsons’ employment responsibilities would not interfere with their visitation. (10) And besides the Easter incident, there was no other proof that the Wilsons had interfered with Stephen’s child-rearing.
¶ 12. Based on this analysis, the chancellor found it within the children’s best interest to have grandparent visitation. Accordingly, the chancellor granted the Wilsons visitation during Thanksgiving (in odd-numbered years), Christmas holidays (in even-numbered years and in odd-numbered years if the Smiths do not visit Mississippi during Thanksgiving), two weeks in summer, and phone calls once a week. Aggrieved, the Smiths filed this appeal on January 4, 2011.
*56 ANALYSIS
¶ 13. This Court will not disturb the chancellor’s factual findings “unless the chancellor abused his discretion, was manifestly wrong, or made a finding which was clearly erroneous.” Zeman v. Stanford, 789 So.2d 798, 801-802 (¶ 12) (Miss. 2001). Questions of law, however, are reviewed de novo. Id.
I. Whether the grandparent-visitation statutes and Martin are unconstitutional in light of Troxel.
II. Whether the chancellor erred in applying the grandparent-visitation statutes and Martin to the Smiths’ case in light of Troxel.
¶ 14. The Smiths argue that the grandparent-visitation statutes and Martin are unconstitutional in light of Troxel.[9] Alternatively, the Smiths maintain that the chancellor erred in applying the grandparent-visitation statutes and Martin to this case because neither requires the chancellor to consider several elements set forth in Troxel. The Wilsons argue that Martin and the grandparent-visitation statutes are constitutional on their face and do not violate the Smiths’ due process rights. Because the Smiths raise similar arguments under Issues I and II, we discuss these issues together.
A. Troxel v. Granville
¶ 15. The Smiths rely on Troxel v. Granville, a United States Supreme Court case which originates from the state of Washington, to support their argument. Troxel, 580 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In Troxel, a couple had two daughters out of wedlock. Id. at 60, 120 S.Ct. 2054. The father lived with his parents and enjoyed visitation with his daughters at their home. Id. After the father died, the grandparents continued to enjoy liberal visitation with the girls, but the mother desired to reduce their visits. Id. at 60-61, 120 S.Ct. 2054. Thus, the grandparents filed a petition requesting visitation rights. Id. at 61, 120 S.Ct. 2054.
¶ 16. The Washington statute provided that:
Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.
Id. (quoting Wash. Rev.Code § 26.10.160(3) (1994)). Troxel’s plurality opinion held the Washington statute unconstitutional, finding the statute “breathtakingly broad,” allowing “[a]ny person” to seek visitation rights “at any time.” Id. at 67, 120 S.Ct. 2054.
¶ 17. The United States Supreme Court also found the statute violated the mother’s substantive due-process rights, because it did not accord any deference to her wishes (to reduce visitation) and authorized a lower court to grant visitation whenever it thought visitation would serve the children’s best interest. Id. Additionally, the Supreme Court noted that the grandparents did not accuse the mother of being an unfit parent, and there was no finding that she had sought to end visitation entirely. Id. at 68, 71, 120 S.Ct. 2054. The Supreme Court stated, “[t]he decisional framework employed by the Superior Court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child ... the *57 court’s presumption failed to provide any protection for Granville’s fundamental constitutional rights to make decisions concerning the rearing of her own daughters.” Id. at 69-70, 120 S.Ct. 2054.
¶ 18. The Supreme Court declined to address whether all nonparental visitation statutes are unconstitutional, stating:
Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific non-parental visitation statutes violate the Due Process Clause as a per se matter.
Id. at 73, 120 S.Ct. 2054.
B. Constitutionality
¶ 19. The Smiths contend that Mississippi Code Sections 93-16-3 and 93-16-5 violate their due process rights, and the grandparent-visitation statutes are unconstitutional. See Miss.Code Ann. §§ 93-16-3 (Supp.2011), 93-16-5 (Rev.2004). Likewise, the Smiths argue that the Martin factors violate their due-process rights, and Martin is unconstitutional. See Martin, 693 So.2d 912 (Miss.1997).
1. Grandparent-Visitation Statutes
¶ 20. The chancellor found that the Wil-sons were eligible for visitation under Section 93-16-3(1), which provides:
(1) Whenever a court of this state enters a decree or order awarding custody of a minor child to one (1) of the parents of the child or terminating the parental rights of one (1) of the parents of a minor child, or whenever one (1) of the parents of a minor child dies, either parent of the child’s parents may petition the court in which the decree or order was rendered or, in the case of the death of a parent, petition the chancery court in the county in which the child resides, and seek visitation rights with the child.
Miss.Code. Ann. § 93-16-3(1) (Supp.2011). Section 93-16-5 addresses standing, enforcement, and modification of visitation. See Miss.Code Ann. § 93-16-5 (Rev.2004). The statute also provides that “the court may, in its discretion, if it finds that such visitation rights would be in the best interest of the child, grant to a grandparent reasonable visitation rights with the child.” Id.
2. Martin v. Coop
¶ 21. In Martin, which was decided pr e-Troxel, the paternal grandparents sought grandparent visitation following their son’s death. Martin, 693 So.2d at 914. The Court determined that Section 93-16-3(1) was constitutional; thus, the grandparents had a statutory right to visitation. Id. But the Court found the visitation awarded was excessive. Id. at 915-916. The Court set forth ten factors for chancellors to consider when awarding visitation:
As always, the best interest of the child must be the polestar consideration. The visitation should be less than that which would be awarded to a non-custodial parent, unless the circumstances overwhelming dictate that that amount of visitation is in the best interest of the child, and it would be harmful to the child not to grant it. The following factors should be considered by the chancery court in determining grandparent visitation, and no one should be weighed more heavily than the others.
1. The amount of disruption that extensive visitation will have on the child’s life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time.
*58 2. The suitability of the grandparents’ home with respect to the amount of supervision received by the child.
3. The age of the child.
4. The age, and physical and mental health of the grandparents.
5. The emotional ties between the grandparents and the grandchild.
6. The moral fitness of the grandparents.
7. The distance of the grandparents’ home from the child’s home.
8. Any undermining of the parent’s general discipline of the child.
9. Employment of the grandparents and the responsibilities associated with that employment.
10. The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent’s manner of child rearing is not to be interfered with by the grandparents.
Id. at 916.
3. Neither Martin nor the grandparent-visitation statutes violates the Constitution.
¶ 22. Unlike the statute in Troxel, Mississippi’s grandparent-visitation statute is narrow, allowing grandparents (not any person) to seek visitation only under certain circumstances. In this case, the Wil-sons had a statutory right to visitation with their grandchildren following the death of their daughter. See Martin, 693 So.2d at 914. The Smiths argue that this distinction is immaterial; we disagree. The Court has addressed the same issue previously in Martin and Zeman v. Stanford. See Martin, 693 So.2d 912 (Miss. 1997); Zeman v. Stanford, 789 So.2d 798 (Miss.2001).
¶ 23. In Martin, this Court ruled that: The Fifth and Fourteenth Amendments to the United States Constitution proscribe governmental interference with individual liberties such as a parent’s right to determine his child’s care, custody and management. See Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982). However, this right is not absolute. See Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (parental decisions may be curtailed by the State as in the best interest of the child). The Mississippi Legislature has determined that a grandparent may petition the court for visitation if a parent has died. This statute does not deprive the parents of their right to raise their children by determining the care, custody and management of the child. Mississippi’s grandparent visitation act does not intrude upon this parental liberty, and as such, it is constitutional.
Martin, 693 So.2d at 915. Relying on Martin, the Court in Zeman held that:[10]
The statute in Troxel swept too broadly by permitting any person to petition at any time with the only requirement being that the court find that visitation serves the best interest of the child. In contrast, this Court, via Martin, specifically requires the Chancellor to consider certain factors before awarding visitation in order to ensure that parents are not deprived of their right to rear their children and determine their children’s care, custody, and management. Martin, 693 So.2d at 915. The limitations imposed by this Court in its interpretation of § 93-16-3 clearly result in the “narrower reading” that was lacking in *59 Troxel. The factors set forth in Marlin specifically prohibit a Chancellor from ordering visitation which would interfere with a parent’s right to rear his or her children.
Zeman, 789 So.2d at 803 (¶ 18).
¶ 24. The statute in Troxel and Mississippi’s grandparent-visitation statutes are distinguishable. The Mississippi statute is more narrow, and Martin provides several factors for chancellors to consider when awarding grandparent visitation. As stated in Zeman, these factors prohibit chancellors from granting any visitation that would interfere with a parent’s substantive due-process rights. Thus, we find the grandparent-visitation statutes and Martin do not violate the Constitution. This argument is without merit.
C. Neither the chancellor’s application of Martin nor the grandparent-visitation statutes violates the Smiths’ due process rights.
¶ 25. Next, the Smiths argue that the chancellor’s application of Martin and the grandparent-visitation statutes are in direct conflict with Troxel. The Smiths maintain the chancellor should have applied a heightened burden of proof-clear and convincing evidence—to prove that visitation was in the children’s best interest. The Smiths also contend that the chancellor failed to defer to his wishes, did not find he was an unfit parent, and did not find that he intended to permanently deny the Wilsons visitation.
1. Clear & Convincing Evidence
¶ 26. The Smiths likened the burden of proof in their case to that of an action to terminate parental rights, claiming the chancellor should have employed a clear-and-convincing-evidence standard. According to the Wilsons, the Smiths’ claim is not supported by caselaw.
¶ 27. The Smiths cite no authority which requires a heightened burden of proof in cases concerning grandparent visitation. A party’s failure to cite relevant authority operates as a procedural bar, and the Court is not obligated to consider the issue. Shavers v. Shavers, 982 So.2d 397, 401 (¶ 22) (Miss.2008). As such, we decline to review this issue.
2. Parent’s Wishes
¶ 28. The Smiths contend that Troxel requires chancellors to defer to the parent’s wishes, and the chancellor failed to consider Stephen’s wishes concerning grandparent visitation. The Wilsons believe the chancellor gave due consideration to Stephen’s decision to deny them visitation.
¶29. It is important to note that the mother in Troxel wished to reduce grandparent visitation, not terminate it completely. The Smiths do not want the Wil-sons to have any court-ordered visitation. The chancellor’s judgment detailed Stephen’s history with the Wilsons and listed events which concerned Stephen:
It is Stephen’s belief that spending too much time with [the Wilsons] is detrimental to [the children’s] well-being. Stephen stated that [the Wilsons] allowed the children too much freedom, and that when he would get the children back from a visitation, it would take him a week to correct their behavior.
[[Image here]]
Stephen’s position is clear. He and he alone wants to determine if and when any visitation shall occur between the children and [the Wilsons].
In regard to Stephen’s concerns, the chancellor determined his complaints against the Wilsons were minor, also stating that:
The [c]ourt is in no doubt that Stephen perceives the visitation as a disruption *60 to his life or perhaps more accurately, his loss of control of the situation.... A disruption to his life is not, in this [c]ourt’s opinion, a disruption to the children’s lives.
¶ 30. The chancellor considered Stephen’s concerns. While a chancellor should accord special weight to a parent’s wishes, there is no automatic right to deference. See, e.g. Troxel, 530 U.S. at 86, 120 S.Ct. 2054 (Stevens, J., dissenting) (“[W]e have never held that the parent’s liberty interest in this relationship is so inflexible as to establish a rigid constitutional shield, protecting every arbitrary parental decision from any challenge absent a threshold finding of harm [E]ven a fit parent is capable of treating a child like a mere possession.”); Brown v. Yates, 68 So.3d 758, 762 (¶ 20) (Miss.Ct.App.2011). The “best interest of the child must be the polestar consideration.” Martin, 693 So.2d at 916. Using the Martin factors, the chancellor found visitation with the Wilsons — the only connection Breely and Banks have to their deceased mother — within the children’s best interest. This assignment of error also is without merit.
3. Unfitness
¶ 31. The Smiths maintain that Troxel requires the court to find the parent unfit before awarding grandparent visitation. Because no such finding was made in this case, the Smiths rely on the presumption noted in Troxel — that fit parents make decisions that are in their children’s best interest. The Wilsons contend that an unfitness requirement would frustrate the purpose of the statute, allowing a parental veto in all other circumstances.
¶ 32. The chancellor did not make a finding of unfitness, and the Wilsons agreed that Stephen was a good father. But unfitness is not required to award grandparent visitation. But see In re Custody of M.A.G., 859 So.2d 1001, 1004 (¶ 6) (Miss.2003) (holding a finding of unfitness is necessary to award custody to a third party over the natural parents). The Court has held “a parent’s right to determine his child’s care, custody and management ... is not absolute.” Martin, 693 So.2d at 915. Unfitness is one factor of many. The chancellor correctly applied the Martin factors to this case and determined that visitation was in the children’s best interest. We find the chancellor’s decision is supported by substantial evidence.
4. Unreasonably Denied Visitation
¶ 33. The Smiths state that Troxel requires a finding that the parent intended permanently to deny visitation to the grandparents. Section 93-16-3(2), which is not at issue here, addresses those grandparents not entitled to visitation under subsection (1) and specifically requires the chancellor to find that the parent unreasonably denied the grandparents visitation rights. Miss.Code Ann. § 93-16-3(2) (Supp.2011); see also Stacy v. Ross, 798 So.2d 1275 (Miss.2001). Troxel actually recognized Mississippi as a state which specifically provides this limitation. Troxel, 530 U.S. at 71, 120 S.Ct. 2054. Although subsection (1) does not expressly list this requirement, the chancellor considered whether Stephen unreasonably denied the Wilsons visitation.
¶ 34. The Smiths maintain that they did not intend permanently to terminate the Wilsons’ visitation. Conversely, the Wil-sons believe the evidence supports a finding that the Smiths unreasonably denied them visitation. Based on the testimony, the Smiths told the Wilsons they would never see their grandchildren again. Holding to that promise, the Smiths did not allow the Wilsons any visitation with Breely and Banks following the Easter incident. When asked if he would volun *61 tarily allow the Wilsons visitation, Stephen would not give a definite answer or time frame within which visitation could resume and said he thought it was reasonable to deny the Wilsons visitation at that time.[11] Stephen even suggested that he might ignore a court order for grandparent visitation if he thought it was in the children’s best interest. Based on this evidence, the chancellor found the Smiths permanently intended to deny the Wilsons visitation:
Stephen’s sense of betrayal and anger have to date not subsided and he has refused to allowed [the Wilsons] any contact whatsoever with the children since April 2010. Furthermore, it is. this [c]ourt’s opinion that Stephen moved to Illinois to further punish [the Wilsons] for their involvement in the Easter weekend incident.[12]
Based on the foregoing, we hold the chancellor’s finding is supported by substantial evidence.
III. Whether the chancellor erred in applying the Martin factors.
¶ 35. Alternatively, the Smiths argue that the chancellor erred in finding three Martin factors favored the Wilsons: the amount of disruption extensive visitation would have on the children, any undermining of the parent’s general discipline of the children, and the willingness of the grandparents to accept the parent’s rearing of the children. The Wilsons maintain that the chancellor properly considered the Martin factors and, thus, did not err in his analysis.
A. Disruption
¶ 36. Martin instructs chancellors to consider:
The amount of disruption that extensive visitation will have on the child’s life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time.
Martin, 693 So.2d at 916. The chancellor noted the great distance between the Wil-sons and the Smiths. The chancellor also noted the Wilsons requested visitation during times the children would be out of school — holidays, spring break, and summer. Thus, the chancellor determined that visitation would not be disruptive.
¶ 37. The Smiths argue that visitation would be disruptive to his family because the children may revert back to their old behaviors, it would limit visitation time with the other grandparents and limit the time the children spend with their new sibling.[13] The chancellor noted that Stephen perceived visitation as a disruption to his life (based on the Smiths’ feud with the Wilsons after the Easter incident). But the court found that a disruption to Stephen’s life was not necessarily a disruption to the children’s lives. The chancellor saw no harm in allowing the children to visit the Wilsons, stating, “spending time with grandparents who allow grandchildren a little more freedom than at home, does not qualify as a disruption.” The Smiths also contend that the chancellor improperly placed the burden on them to prove that visitation would not be disruptive. But after reading the order, the chancellor simply noted that the Smiths did not produce any countervailing evidence.
*62 ¶ 38. The chancellor considered the evidence and properly weighed the factor. Accordingly, we find the chancellor’s decision is supported by substantial evidence.
B. Undermining Discipline
¶ 39. Martin instructs chancellors to consider “[a]ny undermining of the parent’s general discipline of the child[ren].” Martin, 693 So.2d at 916. The chancellor found that, with the exception of the Easter incident, the Wilsons accepted their nonparental role and respected Stephen’s discipline. The chancellor noted that Stephen could not point to a specific instance in which the Wilsons interfered with his discipline of the children.
¶ 40. The Smiths argues that the Wil-sons undermined his discipline by not enforcing his rules — no eating in the bedroom, brushing their teeth at specific times, refraining from screaming and running wild, and respecting adults. The chancellor determined that these things were minor and typical actions by grandparents.
¶ 41. The chancellor considered the evidence and properly weighed the factor. Thus, we find the chancellor’s decision is supported by substantial evidence.
C. Willingness to Accept Rearing
¶ 42. Martin instructs chancellors to consider:
The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent’s manner of child rearing is not to be interfered with by the grandparents.
Martin, 693 So.2d at 916. The chancellor found, with the exception of Easter weekend, there was no proof the Wilsons had interfered with Stephen’s child rearing.
¶ 43. According to Stephen, the Wilsons objected to his regaining physical custody of Breely and Banks in July 2009, and Charlotte interfered with his decision regarding his choice of school for Breely. The evidence shows the Wilsons did not physically stop Stephen from getting the children in July 2009, and Charlotte did not voice her opinion regarding Breely’s school to him. Charlotte shared her concern with Linda, who did not share the conversation with Stephen until many months later. Stephen even admitted that Charlotte’s concerns did not influence his decision.
¶ 44. The chancellor considered the evidence and properly weighed the factor. As long as the chancellor’s factual findings are supported by substantial evidence, this Court should uphold the chancellor’s grandparent-visitation order. Zeman, 789 So.2d at 804 (¶ 23). Because the chancellor’s Martin analysis is supported by substantial evidence, we will not disturb the visitation order.
IV. Whether the chancellor granted excessive visitation.
¶ 45. The chancellor awarded the Wilsons visitation the Friday and Saturday following Thanksgiving (in odd-numbered years), five days following Christmas (in even-numbered years and in odd-numbered years if the Smiths do not visit Mississippi during Thanksgiving), two weeks in summer, and phone calls once per week. The Smiths argue the court-ordered visitation is excessive.
¶ 46. This Court previously has addressed claims of excessive grandparent visitation. “The visitation [granted to a grandparent] should be less than that which would be awarded to a non-custodial parent, unless the circumstances overwhelming dictate that [the] amount of visitation is in the best interest of the child, and it would be harmful to the child not to grant it.” Townes v. Manyfield, 883 So.2d *63 93, 96 (¶ 21) (Miss.2004); see also Martin, 698 So.2d at 915-916 (finding grandparent visitation totaling eighty-six days in even years and eighty-one days in odd years was excessive as visitation that would be awarded to a noncustodial parent). In Woodell v. Parker, 860 So.2d 781 (Miss. 2003), the Court upheld grandparent visitation consisting of one weekend per month, every other spring break/Easter holiday, the Friday and Saturday following Thanksgiving, five days following Christmas, and two weeks in summer. Woodell, 860 So.2d at 790 (¶¶ 30-32).
¶ 47. In this case, the chancellor awarded the Wilsons visitation similar to that awarded in Woodell — visitation during holidays and the summer. Accordingly, we find the Wilsons’ visitation is not excessive.
CONCLUSION
¶ 48. We find that Mississippi’s grandparent-visitation statute and the Martin factors do not violate the Constitution. The chancellor did not err in applying the grandparent-visitation statutes, Martin, and Troxel to this case. The chancellor properly applied the Martin factors to this case. And the Wilsons’ visitation is not excessive. Thus, we affirm the chancellor’s grandparent-visitation order.
¶ 49. AFFIRMED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ„ CONCUR.

. Martin v. Coop, 693 So.2d 912 (Miss.1997).

. Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

. The previous weekend, the Wilsons noticed a bruise on Banks’s right thigh. Breely explained that Melissa had spanked Banks with a wooden spoon.

. Although Melissa was named as a party to the action, the Smiths decided that she should not appear at the hearing because she did not have any legal rights to the children.

. Based on these events, Charlotte filed a "Motion for Emergency Temporary Restraining Order” against Melissa. As exhibits, Charlotte submitted her affidavit, detailing the events, and a transcript of the text and voice-mail messages.

. At the time of trial, both Stephen and Melissa were unemployed.

. That month, Stephen emailed the Wilsons and stated he and Melissa felt betrayed and disrespected by them. Stephen also stated, "[I]f it’s necessary for us to move away in order to have a happy life and be free from your meddling, we are well prepared to do so.”

.According to Larry, Stephen said "no hack judge or lawyer in Columbus was going to tell him what to do.” Stephen admitted the same.

. Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); Martin v. Coop, 693 So.2d 912 (Miss.1997).

. In Zeman, the grandparents sought visitation under the statute’s custody provision.

.Stephen stated he might consider allowing visitation only when he felt the children were mature enough to visit the Wilsons.

. As previously mentioned, Stephen sent the Wilsons an email stating he would move far away if needed.

. Melissa was pregnant at the time of trial.