# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00936-COA

## CONSOLIDATED WITH

## NO. 2017-CA-00084-COA

**TERRY LEE ING**                                                      **APPELLANT**

**v.**

**SONG ADAMS**                                                          **APPELLEE**

DATE OF JUDGMENT:                05/24/2019
TRIAL JUDGE:                             HON. JOHN ANDREW GREGORY
COURT FROM WHICH APPEALED:  MARSHALL COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      JOSEPH WHITTEN COOPER
ATTORNEY FOR APPELLEE:       KENT E. SMITH
NATURE OF THE CASE:          CIVIL - CONTRACT
DISPOSITION:                 AFFIRMED IN PART; REVERSED AND
                             RENDERED IN PART - 08/25/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     This is the second appeal of a Marshall County Circuit Court lease-purchase case. In the first appeal, decided on May 15, 2018, we held that Terry Ing had exercised his option to purchase a building he had rented from Song Adams. We remanded the case to enable Ing to complete the purchase at a sales price of $350,000. Ing was unable to do this, and Adams filed an eviction action. On May 16, 2019, the circuit court not only evicted Ing but also granted a judgment for Adams in the amount of $130,000 for back rent Ing owed. From that judgment, Ing appeals, arguing that the circuit court erroneously set the purchase price at

$350,000 and erroneously granted Adams a judgment for back rent. Because we find that the circuit court did not err in enforcing our previously mandated $350,000 purchase price, but that it did err in calculating the amount of back rent Ing owed, we affirm in part and reverse and render in part.

**Facts**

¶2. Our prior opinion in this case, *Ing v. Adams*, 248 So. 3d 881 (Miss. Ct. App. 2018), contains the facts of the first phase of this case. Adams, the owner of a three-story building in Holly Springs, Mississippi, leased the basement to Ing for a five-year period beginning January 27, 2010, paying $2,500 per month. Ing had purchased the pizza business that was already in operation. He would occupy the basement while Adams ran a liquor store on the first floor and rented out an apartment on the third floor.

¶3. The Adams-Ing lease agreement included a purchase option that gave Ing the right to purchase the entire building at the end of the lease:

> At the end of this current five year lease provided that Lessee is current upon all conditions of this lease, he has the option to extend the lease for an additional five years or to purchase the building at [its] then appraised value.

If Ing did not exercise that option, the lease would become a month-to-month lease.

¶4. Four days prior to the expiration of the lease, in January 2015, Ing notified Adams of his desire to purchase the building, but Adams refused to sell it. Ing stopped paying rent, and Adams filed a complaint in the circuit court for eviction, damages, and other relief. Ing counterclaimed for damages and other relief, including specific performance.

¶5. At the circuit court's bench trial of the matter on May 26, 2016, Adams presented, for

2

the first time, a $350,000 appraisal of the building she had obtained on February 13, 2015, from Michael Shaw, a licensed certified residential real estate appraiser.[1] On December 23, 2016, the circuit court issued its final judgment with findings of fact. The court ruled that although Ing was not in material breach of the contract as Adams had alleged, Ing had failed to exercise his option to purchase. The court granted Adams's motion to evict and found Ing liable for back rent. Ing appealed on January 23, 2017, and posted a bond to stay the execution of the circuit court's order.

¶6.     After the bench trial in May 2016, but before the December 2016 written judgment, Ing obtained his own appraisal of the property, which  prepared by Jeff Norwood of Rip Walker and Associates, licensed certified general real estate appraisers. In the July 7, 2016 report of the appraisal performed on June 21, 2016, Norwood assessed the property to be valued at $255,000. The parties apparently used Adams's and Ing's appraisals to try to

_____

[1] Mississippi licenses two types of appraisers:

The following shall be the two (2) classes for licensed certified real estate appraisers:

(a) Licensed certified residential real estate appraiser. The licensed certified residential real estate appraiser classification shall consist of those persons who meet the requirements that relate to the appraisal of residential real property of one (1) to four (4) units without regard to transaction value or complexity. In addition, when nonfederally related transactions are involved, the licensed certified residential real estate appraiser shall enjoy the same privileges as set forth for the licensed real estate appraiser.

(b) Licensed certified general real estate appraiser. The licensed certified general real estate appraiser classification shall consist of those persons who meet the requirements relating to the appraisal of all types of real estate.

Miss. Code Ann. § 73-34-19 (Rev. 2014).

negotiate a settlement, but they were unable to agree on a purchase price. But when negotiations broke down, Ing did not bring this second appraisal to the circuit court's attention before the court ruled in December 2016. Thus, the record on the first appeal contained only the $350,000 appraisal from Adams.

¶7.     In January 25, 2018, we heard oral argument on the matter. Ing's counsel told us that he obtained a second appraisal but did not tell us the amount because it was not in the record. Adams took the position that she had put a $350,000 appraisal into the record and that Ing had not countered it. Ing's attorney was further questioned about the matter of having only the single appraisal in the record:

> Wilson, J.:     So what happens if you find an appraiser that says $250,000 and hers says $350,000, and they don't agree, what is the appraised value?
>
> Counsel:     I think the appraised value would be whatever a judge states that the appraised value should be, given both . . .
>
> . . . .
>
> Carlton, J.:     Why isn't Mr. Ing stuck with the appraisal that is in the record since he did not present his own opposing appraisal at the trial court below?
>
> Counsel:     Mr. Ing went to trial with the understanding that he was going to have to prove that he did not breach the contract. That is what is in the lawsuit. He is going to have to prove that he did (inaudible) his option to purchase. It was Mr. Ing's assertion that he went to trial to show that he should be given an opportunity to go forward with buying the property.
>
> Carlton, J.:     But Mr. Ing filed a counterclaim asking for general and specific relief and . . . before the trial judge, asked for specific performance.

Counsel: Yes, your honor, he did and at that point we did not have an appraisal done. I agree with that, your honor. So if it is the Court's determination that he is, for lack of a better term, "stuck" with the $350,000, then Mr. Ing will accept that. And if that would be the ruling, and if that is the ruling, I think there is a proper foundation laid for that to be the ruling, if this court decides that.

¶8.     After oral argument, we reversed the circuit court's decision in our opinion issued on May 15, 2018. We found that Ing had properly exercised his option to purchase Adams's building. *Id.* at 886 (¶22). Because he did so, Ing became an equitable owner of the property and not a "holdover tenant" subject to liability for accruing rent charges while the case was in litigation. *Id.* at 887 (¶26). We acknowledged that "at oral argument, Ing essentially conceded that he was "stuck" with the $350,000 appraisal presented by Adams at trial since he had not offered one." *Id.* at 885 (¶18). However, we also noted that "once Adams refused to convey the property, Ing was not required to take any of these steps." *Id.* at (¶19). We remanded the case for the trial court to set a reasonable closing date for the sale of the property, taking into account Ing's need, if any, to secure financing based on the sole appraisal offered at trial. *Id*. at 887 (¶27). We also said that "in the event that Ing fails to meet his obligations to tender the purchase price and close on the contract the issue of holdover rent would have to be revisited." *Id.* at 887 n.6 After our decision May 15, 2018, Ing filed no motion for rehearing, nor did he challenge our mandate that issued on June 5, 2018.

¶9.     On remand, Adams promptly filed a "Motion to Set a Closing Deadline and for Other Relief" with the Marshall County Circuit Court on May 24, 2018. She requested a deadline

5

(date and time) for the closing of the purchase at the appraised price of $350,000. On May 30, 2018, the circuit court entered an order setting the closing date within ninety days of the entry of the order or by 3:00 p.m. on August 28, 2018. The court also addressed the bond funds ($30,000) that were being held by the Ing's lawyers, the Farese Law Firm, and ordered that they not be disbursed except to serve as a down payment on the purchase. The court also noted that if Ing failed to meet his obligations to tender the purchase price and close on the contract, the issue of holdover rent would be revisited.

¶10. Ing sought financing for the purchase. In that process, the two banks he contacted each secured appraisals of the property. The Bank of Holly Springs retained Rip Walker and Associates to prepare another appraisal. Again, Jeff Norwood appraised the property at $255,000. Renasant Bank obtained an appraisal from Integra Realty Resources, another licensed general appraisal company, which valued the building at $280,000. Based on the Integra appraisal, on June 20, 2018, Renasant approved Ing for a loan of $255,000 (approximately 85% of the appraised value).

¶11. Counsel for Ing asserts, and Adams does not deny, that the parties again attempted to negotiate a settlement based on the various appraisals and the confirmation that Ing could obtain financing, albeit not enough to pay the $350,000 that Adams claimed was the value. The $350,000 appraisal, performed by only a residential appraiser, could not be used by banking institutions that may use federal funds, and thus they needed a general real estate appraiser pursuant to the statute. Therefore, the banks Ing approached would not finance any more than the appraisals given by appraisers who were licensed to appraise commercial

6

properties. The parties were unable to resolve the issue.

¶12. The deadline for closing passed, and on November 30, 2018, Adams filed a "Motion to Evict and For Other Relief." The motion was set for hearing on April 17, 2019.

¶13. On April 12, 2019, Ing filed his response to the motion and included in that pleading a "Motion to Determine Appraisal Value of 110 Van Dorn Avenue." Ing informed the circuit court that he and Adams had been unable to agree on a purchase price when the case was first pending on appeal and that they were still unable to even though they now had three appraisals—the one that Adams had secured ($350,000), and the two that the banks had secured, valuing the property at $255,000 and $280,000. Ing argued that this Court had erred in remanding the case with instructions that the property be sold at the appraised value of $350,000 because this appraisal was prepared by a licensed *residential* appraiser and that statutorily, it cannot be relied upon by financial institutions that may use federal funds to finance the potential loan. Ing argued that he should not be required to purchase a building at a price $70,000 higher than what a *commercial* appraiser says it was worth and that he could not obtain financing for the $350,000 figure. He asked the court to compel Adams to sell him the property at a price no more than $280,000, and he renewed his request for damages.

¶14. On May 15, 2019, Adams replied to Ing's response to her motion to evict, and the next day, the circuit court heard testimony from Ing's appraiser and arguments from counsel. The circuit court ruled from the bench that given the instructions in the appellate opinion, the court did not think that it had any choice on the issue of the property's sales price being

7

$350,000. The Court found that Ing had not closed by the deadline the court set. Accordingly, the court granted Adams's motion to evict and ordered payment of $2,500 per month as back rent, beginning from the end of the lease (January 27, 2015).

¶15. On May 24, 2019, the court's ruling was incorporated in a written judgment. The court gave Ing until June 16, 2019, to vacate the property or be evicted and found that he owed back rent from January 27, 2015, through May 2019, in the total amount of $130,000.

¶16. On June 6, 2019, Ing filed his notice of appeal and raises two issues: whether the trial court erred in refusing to invalidate the original appraisal when new evidence indicated that it overvalued the property, causing Ing to be unable to secure financing, and whether the trial court erred in finding that Ing was not an equitable owner and owed back rent for failing to purchase the property.

**Standard of Review**

¶17. "The standard of review for a judgment entered following a bench trial is well settled." *Maldonado v. Kelly*, 786 So. 2d 906, 908 (¶4) (Miss. 2000). An appellate court will not disturb the trial court's factual findings unless the trial court "abused [its] discretion, was manifestly wrong, or made a finding that was clearly erroneous." *Smith v. Wilson*, 90 So. 3d 51, 56 (¶13) (Miss. 2012).

**Discussion**

I. **Whether the circuit court erred in refusing to invalidate the original appraisal.**

¶18. Ing argues that the circuit court erred when it required him to purchase Adams's building at the $350,000 price that Adams demanded. He contends that new evidence, i.e.,

two subsequent appraisals that valued the property at $255,000 and $280,000, proved that the building was overvalued by the $350,000 appraisal.  It is reversible error, Ing claims,  for the circuit court to have ignored this new evidence.  However, this court had mandated that the building be sold for that figure—a mandate that Ing did not challenge.  Therefore we disagree and find no error by the circuit in enforcing our mandated purchase price of $350,000.

¶19.    Ing concedes that all parties are bound by the our judgment and mandate from the first appeal of this case.  We have repeatedly reiterated that a mandate is "an order of this Court which must be followed without deviation." *Griner v. Griner*, 282 So. 3d 1243, 1247 (¶12) (Miss. Ct. App. 2019).  "Where [an appellate court] has already decided a specific issue in a case on a prior appeal, the trial court has been found to be in error where, on remand, it has refused to follow [the appellate court's] opinion and directions." *Nelson v.* Bonner 13 So. 3d 880, 883 (¶5) (Miss. Ct. App. 2009).  The trial court has no discretion whether to follow a mandate. *Griner*, at 1247 (¶13).

¶20.    This may appear harsh, but prior to the trial court's hearing on remand, there are opportunities for a party to challenge an appellate ruling.  A party who disputes the ruling of the appellate court may challenge it by filing a motion for rehearing pursuant to Rule 40(a) of the Mississippi Rules of Appellate Procedure,which states:

> A motion for rehearing may be filed within 14 days after a decision is handed down on the merits of a case by the Supreme Court or the Court of Appeals. The motion shall state with particularity the points of law or fact which, in the opinion of the movant, the court has overlooked or misapprehended and shall contain such argument in support of the motion as movant desires to present. The motion for rehearing should be used to call attention to specific errors of

> law or fact which the opinion is thought to contain; the motion for rehearing is not intended to afford an opportunity for a mere repetition of the argument already considered by the court. Oral argument in support of the motion will not be permitted.

M.R.A.P. 40(a). "The purpose of a motion for rehearing is to provide this Court an opportunity to correct any errors on issues already presented and decided." *White v. State*, 761 So. 2d 221, 225 (¶22) (Miss. Ct. App. 2000).

¶21.    If a party fails to file such a motion within the time allotted time, the judgment of the appellate court becomes res judicata with respect to the parties. *Dunn v. Dunn*, 853 So. 2d 1150, 1153 (¶10) (Miss. 2003).  For example, in *Griner*, in a prior appeal, we ordered the wife to pay all costs of the appeal.  *Griner*, at 1247 (¶10).  The husband filed a motion for rehearing, but the wife did not.  *Id*. at (¶11).  On remand, the husband filed a motion for recovery of the appeal costs that we ordered the wife to pay.  *Id.* at (¶14).  The chancery court failed to assess the wife with the appellate fees and we reversed, saying that "the chancery court did not the discretion to ignore the mandate."  *Id.* at 1248 (¶16).  The wife had not sought rehearing when we reached the decision, so she could not challenge our findings or mandate thereafter. *Id.*

¶22.    Further, a mandate issued by an appellate court becomes the law of the case:

> This doctrine dictates that a mandate issued by this Court is binding on the trial court on remand, unless the case comes under one of the exceptions to the law of the case doctrine.  Exceptions to the law of the case doctrine are material changes in evidence, pleadings or findings, or the need for the Court to depart from its former decision after mature consideration so that unjust results will not occur.

*City of Hernando v. N. Miss. Util. Co.*, 3 So. 3d 775, 786 (¶30) (Miss. Ct. App. 2008)

(citations omitted). But, "if the facts are different, so that the principles of law announced on the first appeal are not applicable, as where there are material changes in the evidence, pleadings, or findings, a prior decision is not conclusive upon questions presented on the subsequent appeal." *Ill. Cent. Gulf R. Co. v. Travis*, 106 So. 3d 320, 326 (¶13) (Miss. 2012) (quoting *Fortune v. Lee Cty Bd. of Supervisors*, 725 So. 2d 747, 751 (¶6) (Miss.1998); *see also Griner*, 282 So. 3d at 1250 (¶23-24) ("Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts.").

¶23. In the case at hand, the lease-purchase option contained in the Ing-Adams rental agreement gave Ing the opportunity to purchase the building "at [its] appraised value." The provision did not specify what appraised value the parties intended—whether one determined by a commercial real estate appraiser or one prepared by a residential appraiser. Nor did the provision include any conditions such as Ing's ability or inability to secure financing.

¶24. Ing took no steps to include the alternative appraisal that he obtained in July 2016 in the record in the prior appeal. He could have added it between the bench trial in May and the chancery court's judgment in December so that it could be reviewed by us in the first appeal. At oral argument, Ing's attorney told us there was a second appraisal, but he did not say that the value was different. He agreed that if this Court ruled that the purchase price would be $350,000, there was foundation in the record for us to do so. We did so rule in our opinion in May 2018. While our mandates should not improperly "usurp the role of fact-finder," *Estate of Burgess v. Trotter*, 6 So. 3d 1109, 1115 (¶23) (Miss. Ct. App. 2008), Ing

11

had an opportunity to advise us of the existence of another appraisal that disputed the $350,000 value even during oral argument. But he did not.

¶25. Thereafter, although Ing was aware that this Court had set the sales price and that he he had obtained an assessed value in July 2016 that was less than $350,000, Ing took no steps to seek re-hearing from us on the matter. Nor did he seek a writ of certiorari from the Supreme Court or move for a stay of the mandate in order to do so, as is allowed under Rule 41 of the Mississippi Rules of Appellate Procedure.[2] Because Ing sought no further consideration from the appellate courts on the issue, the sales price was set by our previous opinion and mandate.

---

[2] Relevant portions of Rule 41 include:

(b) Date of Issuance: Court of Appeals. Unless otherwise ordered, the mandate of the Court of Appeals shall issue 21 days after the latest of: the entry of judgment; the disposition of a timely motion for rehearing; or the denial or dismissal of a petition for certiorari review in the Supreme Court. If the Mississippi Supreme Court grants certiorari review, the mandate shall issue in accordance with Rule 41(a).

(c) Stay of Mandate Pending Application for Certiorari. A stay of the mandate pending application to the United States Supreme Court for a writ of certiorari may be granted upon motion, reasonable notice of which shall be given to all parties. The stay shall not exceed 90 days unless the period is extended for cause shown. If during the period of the stay there is filed with the clerk of Supreme Court a notice from the clerk of the United States Supreme Court that the party who has obtained the stay has filed a petition for the writ in that Court, the stay shall continue until final disposition by that Court. Upon the filing of a copy of an order of the United States Supreme Court denying the petition for writ of certiorari, the mandate shall issue immediately. A bond or other security may be required as a condition to the grant or continuance of a stay of the mandate.

M.R.A.P. 41.

¶26. Ing contends that after the first appeal, his case became one of contesting appraisals as in *Crow v. Crow Sports Center*, 119 So. 3d 352 (Miss. Ct. App. 2012). We disagree. In *Crow*, the lease-purchase option read that the sales price would be determined "by an appraisal by a licensed real estate appraiser." *Id*. at 354 (¶2). The controversy arose when the parties each obtained qualifying appraisals that differed sharply. *Id*. (¶3-4). The chancery court judge had to choose one and from that choice, the losing party appealed. *Id*. at 355 (¶7-8). Because of the wide disparities in the values of the appraisals, we reversed the decision and ordered the chancery court to obtain an independent appraisal and rehear the matter. *Id*. at 356 (¶15). The difference between *Crow* and this case is obvious. In this case, the sales price was decided and set as a result of the first appeal. There was nothing more for the chancery court to do but enforce the mandate, which it did.

¶27. Ing further invokes the exception to the "law of the case doctrine," arguing that the appraisals secured by the banks after remand are "new evidence" that relieved the chancery court of its obligation to enforce our mandate. We disagree. It is undisputed that the same parties are involved, and despite Ing's claims, there is a similarity of facts. At the time of the first appeal, and even before that, prior to the chancery court's first opinion in this case, Ing had secured an appraisal which valued the property at $255,000. Ing did not present that figure to the chancery court before it made its decision, nor did Ing present it to us before we made ours. On remand, one of Ing's banks secured the same appraisal from the same appraiser Ing had used. Thus, there were no "new" facts developed after we issued our mandate—just different documents reflecting the same fact, i.e., that the property may be

worth less than the $350,000 appraisal.  That Ing could not secure financing at the $350,000 is an irrelevant fact, because the option provision in the lease agreement was not conditioned on Ing being able to do so.  There being the same parties and similar facts, our prior mandate stands as the law of the case and the chancery court did not err in enforcing it.

## II.     Whether the circuit court erred in finding that Ing was not an equitable owner and owed back rent from June 2015.

¶28.    The circuit court held that Ing had "failed to tender any money and has not purchased the building from the Plaintiff" yet he continued to occupy the building.  The circuit court pointed to a footnote in our first opinion that stated "in the event that Ing fails to meet his obligations to tender the purchase price and close on the contract, the issue of holdover rent would have to be revisited."  The court then ordered that Ing be immediately evicted no later than June 16, 2019.  It further ordered that Ing pay holdover rent in the amount of $2,500 per month going back to the date of the expiration of the lease: January 27, 2015, through May 2019.

¶29.    On appeal, Ing argues that the circuit court was in error because Ing claims he did not breach any terms of the original lease agreement.  In the alternative, he argues that it would be inequitable for Adams to benefit from her own misdeeds.  We disagree with Ing's analysis but reverse the circuit court's assessment of back rent Ing owes.

¶30.    In our prior decision, we reasoned that because Ing exercised his option, which required only notification to Adams of his intent to do so, Ing became an "equitable owner" of the property.  *Ing*, 248 So. 3d at 887 (¶24).  We said:

> This point bears emphasis: at no point was [Ing] a holdover tenant.  Thus, no

14

> holdover rent was due by law, as [Ing] was the equitable owner of the property and was not a holdover tenant.

*Id*. at 887 (¶26).

¶31. It was Adams's refusal to convey the property to Ing that warranted our ruling on Ing's status. We referenced the case of *Fairchild v. Bilbo*, 166 So. 3d 601, 607 (¶16) (Miss. Ct. App. 2015), which found that "because it was the landlord that breached the contract, the tenants are not in default for discontinuing their monthly payments." Just as our mandate set the sales price for the building, our opinion established that between January 27, 2015 and the time Ing failed to close on the building, he was an equitable owner and owed no back rent up to that time.

¶32. On remand, however, Ing's status changed. After our opinion and mandate, Adams no longer refused to sell the property to Ing. To the contrary, Adams moved the circuit court to set a date for closing the sale. Adams was no longer in breach of contract. Neither was Ing until he failed to close by the August 28, 2018 deadline. At that point, Ing lost his equitable ownership status and became a tenant holding over on his lease. Accordingly, we find no error by the circuit court in finding that Ing owes Adams back rent.

¶33. But we do find error in the circuit court's calculation of the back rent owed. To assess the amount, the circuit court went back to the end of lease when Ing first exercised his option to purchase: January 27, 2015. The total from that date through May 2019 amounted to $130,000,[3] and the circuit court awarded Adams a judgment for that amount. However, Ing

___

[3] The circuit court calculated back rent owed for fifty-two months at $2,500 per month.

was a equitable owner for part of that time, and the circuit court should have calculated rent from the time Ing lost that status, i.e., from the time he failed to close, August 28, 2018, forward. Assuming Ing vacated the premises, or was evicted by June 16, 2019, as the circuit court ordered, the back rent amount Ing owes is ten months at $2,500 per month,[4] or $25,000.[5] Accordingly, we reverse the judgment of the circuit court for the amount of the back rent owed and render judgment for Adams in the amount of $25,000.

## Conclusion

¶34. Because Ing failed to challenge this court's opinion and mandate, we find no error by the circuit court in enforcing our mandate that Ing purchase the building at the price of $350,000. When Ing failed to close on the property, Ing no longer held "equitable ownership" status and became a holdover tenant liable for future rent. We affirm the circuit court's finding Ing as such, but we reverse and render on the amount of back rent Ing owes,

---

[4] Adams did not cross appeal the monthly rental amount that the circuit court used in calculating the back rent owed. Technically, as a holdover tenant, Ing could have been charged double rent under Mississippi Code Annotated section 89-7-25 (Rev. 2011):

> When a tenant, . . . shall fail or refuse to quit the demised premises and deliver up the same . . . he shall . . . thenceforward pay to the landlord double the rent which he should otherwise have paid. . .

Miss. Code Ann. § 89-7-25. Here Adams did not challenge the circuit court's use of the $2,500 per month figure, nor cross-appeal the issue. Accordingly, Ing is only required to pay $2,500 per month for the period of time after failing to close that he remained in the building.

[5] If Ing did not vacate the building by June 16, 2019, as required in the circuit court's eviction order, further rent at the rate of $2,500 per month would accrue until he did.

16

reducing it from $130,000 to $25,000.[6]

¶35. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE AND McCARTY, JJ., CONCUR.**

---

[6] The circuit court's May 24, 2019 order does not deal with the $30,000 in bond funds being held by the Farese Law Firm. If not already distributed, said funds may be used by Ing to pay the back rent owed.