LEE, P.J.,
 

 for the Court.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 1. In August 2004, Harry Vinson (Vinson) filed a petition in the DeSoto County Chancery Court seeking visitation with his granddaughter, Reagan Vinson. Reagan is the daughter of Elizabeth Vinson Vidal (Elizabeth) and Harry’s son, Brad Vinson. Elizabeth and Brad had divorced in 1999, and Elizabeth had been awarded physical custody of Reagan. Brad died in 2004, instigating the petition for grandparent’s visitation.
 

 ¶ 2. The chancellor awarded Vinson temporary visitation. The parties agreed to expand visitation, and as of March 2006, Vinson received one Saturday per month for visitation with Reagan. Another chancellor was assigned to the case, and a hearing was held on the matter. In August 2007, the chancellor denied Vinson’s petition for grandparent’s visitation and ordered Vinson to pay $18,226.79 to Elizabeth for her attorney’s fees. Vinson now appeals, asserting that the chancellor erred in terminating his visitation and in awarding attorney’s fees to Elizabeth.
 

 STANDARD OF REVIEW
 

 ¶ 3. Absent an abuse of discretion, this Court will not reverse the decision of the chancellor.
 
 Martin v. Coop,
 
 693 So.2d 912, 914 (Miss.1997). “This Court will not disturb the factual findings of the chancellor unless said factual findings are manifestly wrong or clearly erroneous.”
 
 Id.
 
 (citing
 
 McAdory v. McAdory,
 
 608 So.2d 695, 699 (Miss.1992)).
 

 DISCUSSION
 

 ¶ 4. We first note that Elizabeth has failed to file a brief in this matter. This Court has long held that an appellee’s failure to file a brief is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and the brief of the appealing party, that there was no error.
 
 Varvaris v. Perreault,
 
 813 So.2d 750, 752(¶ 5) (Miss.Ct.App.2001) (citing
 
 Dethlefs v. Beau Maison Dev. Corp.,
 
 458 So.2d 714, 717 (Miss.1984)). “Automatic reversal is not required where [the] appellee fails to file a brief.”
 
 Id.
 
 (quoting
 
 N.E. v. L.H.,
 
 761 So.2d 956, 962(¶ 14) (Miss.Ct.App.2000)). In order to merit reversal, “[t]he appellant’s argument ‘should at least create enough doubt in the judiciousness of the trial court’s judgment that this Court cannot say with confidence that the case should be affirmed.”
 
 Id.
 
 (citing
 
 Selman v. Selman,
 
 722 So.2d 547, 551(¶ 13) (Miss.1998)). After considering the record and brief, we can say with confidence that there was no error.
 

 I. TERMINATION OF VINSON’S VISITATION
 

 ¶ 5. In his first issue on appeal, Vinson argues that the chancellor erred in terminating his visitation rights. It is well settled that “[n]atural grandparents have no common-law ‘right’ of visitation with their grandchildren. Such right, if any, must come from a legislative enactment.”
 
 In re Adoption of Minor,
 
 558 So.2d 854, 856 (Miss.1990) (citing
 
 Olson v. Flinn,
 
 484 So.2d 1015, 1017 (Miss.1986)). In 1983, the Mississippi Legislature enacted the
 
 *616
 
 grandparents’ visitation rights statutes, codified at Mississippi Code Annotated sections 93-16-1 to -7 (Rev.2004). These statutes outline how a grandparent may-seek the opportunity to secure visitation with a grandchild. According to section 93-16-3(1) (Rev.2004), “either parent of the child’s parents who was not awarded custody ... or who has died ... may petition the court ... and seek visitation rights with such child.”
 

 ¶ 6. Although a grandparent has standing to petition for visitation, a natural grandparent’s statutory right to visit his grandchild is not as comprehensive as a parent’s visitation rights.
 
 Settle v. Galloway,
 
 682 So.2d 1032, 1035 (Miss.1996). As always, the best interest of the child is the paramount consideration when determining visitation.
 
 Morgan v. West,
 
 812 So.2d 987, 992(¶ 13) (Miss.2002). In
 
 Martin,
 
 our supreme court listed ten factors that should be considered in determining grandparent visitation. The factors are as follows:
 

 1. The amount of disruption that extensive visitation will have on the child’s life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time.
 

 2. The suitability of the grandparents’ home with respect to the amount of supervision received by the child.
 

 3. The age of the child.
 

 4. The age, and physical and mental health of the grandparents.
 

 5. The emotional ties between the grandparents and the grandchild.
 

 6. The moral fitness of the grandparents.
 

 7. The distance of the grandparents’ home from the child’s home.
 

 8. Any undermining of the parent’s general discipline of the child.
 

 9. Employment of the grandparents and the responsibilities associated with that employment.
 

 10. The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent’s manner of child rearing is not to be interfered with by the grandparents.
 

 Martin,
 
 693 So.2d at 916. The
 
 Martin
 
 court acknowledged that this list was not all-inclusive, stating that the chancellor should weigh “all circumstances and factors he [or she] feels to be appropriate.”
 
 Id.
 

 ¶ 7. The chancellor addressed all of the factors in
 
 Martin,
 
 ultimately finding that it was in the best interest of Reagan to cease visitation with Vinson. In regard to the first factor, the chancellor found that visitation with Vinson caused disruption in Reagan’s life. The chancellor noted that Reagan was unhappy visiting with Vinson and would become physically ill the week preceding the visits. Reagan testified that she had a heart condition, for which she takes medication. In regard to the second factor, the chancellor found no evidence that Vinson’s home was unsuitable. In regard to the third factor, the chancellor found that Reagan was thirteen years old, and she would take Reagan’s preference into consideration. Reagan testified that she would keep visiting Vinson if the chancellor ordered her to do so, but she would rather visit him when she chose to do so. The chancellor also noted that Reagan’s activities will increase as she grows older, possibly creating problems with visitation.
 

 ¶ 8. In regard to the fourth factor, the chancellor found Vinson to be a young grandparent in good health. In regard to the fifth factor, the chancellor found that although Vinson and his longtime girl
 
 *617
 
 friend, Patty, loved Reagan, Reagan did not appear to have the same emotional attachment to Vinson. However, the chancellor put most of the blame on Elizabeth for instilling in Reagan a fear of Vinson. Elizabeth and Vinson had a contentious relationship at best and had not spoken with each other in approximately seven years.
 

 ¶ 9. In regard to the sixth factor, the chancellor noted her concern that Vinson and his girlfriend, Patty, had been together for almost twenty years and living together for more than ten years, but they had never officially married. In regard to the seventh factor, the chancellor found that the distance from Vinson’s house to Reagan’s was a concern because of the length of time spent in the car on visitation days. The trip from Vinson’s house to Reagan’s house took approximately one and one-half hours, and the chancellor voiced her concern over Reagan spending three hours a day in the car. In regard to the eighth factor, the chancellor found no issue due to the fact that there was no testimony that Vinson undermined Elizabeth’s discipline. In regard to the ninth factor, the chancellor found that Vinson and Patty had flexible work schedules which would not affect their visitation with Reagan.
 

 ¶ 10. In regard to the tenth factor, the chancellor was concerned about the lack of communication between the parties. The chancellor was concerned that Vinson did not know Elizabeth’s “manner of child rearing” and might not be able to handle certain situations. Although the chancellor noted that Vinson had handled certain situations in a responsible manner, she found this factor weighed against Vinson.
 

 ¶ 11. The chancellor then found that it was not in Reagan’s best interest to continue visitation with Vinson. The chancellor stated that “I don’t think it is fair to traumatize a child and make her continue to have forced visitation.... [CJhildren that age do not like to be pressured[,] and she is already feeling pressure from Elizabeth to not go and to not want to have anything to do with [Vinson].” The chancellor ceased Reagan’s visitation with Vinson and urged Vinson and Elizabeth to repair their relationship. The chancellor hoped that Reagan would want to resume visitation at some later date, rather than being forced to visit with Vinson.
 

 ¶ 12. Even though the chancellor realized that Elizabeth was the cause of Reagan’s negative feelings toward Vinson, the chancellor decided that it was in Reagan’s best interest to cease visitation. The chancellor relied heavily upon Reagan’s testimony that she did not want to be forced to visit Vinson. We note that visitation with Vinson had occurred without incident for approximately two years, and many of the instances that Elizabeth cited as causing stress to Reagan either happened approximately seven or eight years ago during Elizabeth’s divorce proceedings with Brad or were unrelated to the visitation. However, the chancellor found that it was in Reagan’s best interest to allow her the freedom to visit with Vinson when she chose to do so. The chancellor weighed the
 
 Martin
 
 factors and determined that it was in Reagan’s best interest to cease visitation. We cannot find that the chancellor abused her discretion in doing so; thus, we affirm.
 

 II. AWARD OF ATTORNEY’S FEES TO ELIZABETH
 

 ¶ 13. In his other issue on appeal, Vinson argues that the chancellor erred in awarding Elizabeth attorney’s fees in the amount of $18,226.79. Vinson contends that the chancellor mistakenly relied upon Mississippi Code Annotated section 93-16-3(4) (Rev.2004) in awarding attorney’s fees. Section 93-16-3(4) states as follows:
 

 
 *618
 
 Any petition for visitation rights under subsection (2) of this section shall be filed in the county where an order of custody as to such child has previously been entered. If no such custody order has been entered, then the grandparents’ petition shall be filed in the county where the child resides or may be found. The court shall on motion of the parent or parents direct the grandparents to pay reasonable attorney’s fees to the parent or parents in advance and prior to any hearing, except in cases in which the court finds that no financial hardship will be imposed upon the parents. The court may also direct the grandparents to pay reasonable attorney’s fees to the parent or parents of the child and court costs regardless of the outcome of the petition.
 

 Section 93-16-3(2) allows grandparents who are not authorized to petition for visitation rights pursuant to section 93-16-3(1) another manner of seeking visitation.
 
 See
 
 Miss.Code Ann. § 93-16-3(2) (Rev.2004). Vinson petitioned for visitation pursuant to 93-16-3(1) and, therefore, contends that subsection (4) is not applicable to a petition filed pursuant to subsection (1). The chancellor found that the award of attorney’s fees in grandparent visitation cases is not limited to a petition filed under subsection (2).
 

 ¶ 14. In
 
 Zeman v. Stanford,
 
 789 So.2d 798, 805(¶ 28) (Miss.2001), the grandparent filed a petition under subsection (1), and the chancellor denied attorney’s fees finding that the father had the ability to pay the attorney’s fees. The supreme court affirmed, finding that an award of attorney’s fees is “largely a matter entrusted to the sound discretion” of the chancellor, and absent an abuse of discretion, the chancellor’s decision will be upheld.
 
 Id.
 
 at 806(¶ 30). In
 
 Solomon v. Robertson,
 
 980 So.2d 319, 322(¶ 8) (Miss.Ct.App.2008), this Court upheld the chancellor’s decision to deny the mother attorney’s fees in a grandparent-visitation case filed under subsection (1). We agreed with the chancellor’s determination that the mother failed to prove financial hardship and inability to pay.
 
 Id.
 
 These cases do not specifically discuss whether subsection (4) applies to cases filed pursuant to subsection (1), and we can find no cases that hold as such. However, these cases ultimately rested upon whether the chancellor abused his discretion in determining whether to award attorney’s fees. In the present case, we find that the chancellor did not abuse her discretion in awarding Elizabeth attorney’s fees. The chancellor found that Elizabeth did not have the financial ability to pay the attorney’s fees. Elizabeth testified that she had lost her home through foreclosure, worked at a low-paying job, and had trouble paying for Reagan’s clothes. We reiterate that subsection (4) states that the court may direct the grandparents to pay attorney’s fees to the parent “regardless of the outcome of the petition.” Miss.Code Ann. § 93-16-3(4). We affirm the decision of the chancellor awarding attorney’s fees to Elizabeth.
 

 ¶ 15. THE JUDGMENT OF THE DE-SOTO COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., MYERS, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J„ CONCURS IN RESULT ONLY.