# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00137-COA

**BRADLEY C. POOLE**                                                    **APPELLANT**

**v.**

**NINA RENEE POOLE**                                                    **APPELLEE**

DATE OF JUDGMENT:               01/06/2022
TRIAL JUDGE:                    HON. RODNEY PURVIS FAVER
COURT FROM WHICH APPEALED:      LOWNDES COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:         DONNA SUE SMITH
ATTORNEY FOR APPELLEE:          WILLIAM PAUL STARKS II
NATURE OF THE CASE:             CIVIL - CUSTODY
DISPOSITION:                    AFFIRMED - 09/12/2023
MOTION FOR REHEARING FILED:

**EN BANC.**

**WESTBROOKS, J., FOR THE COURT**:

¶1.     Bradley Poole and Samantha Jean Pruitt are the biological parents of BJ.[1]  In May 2016, BJ's parents signed an agreed order appointing BJ's paternal grandmother Nina Renee Poole as guardian.  Testimony indicates that when BJ was born, Samantha was abusing drugs, and Bradley was in financial straits.  Four years later, Bradley petitioned for the termination of Renee's guardianship.  After an order transferring venue, the Lowndes County Chancery Court found that Bradley was a suitable parent, terminated Renee's guardianship, and awarded Bradley custody of BJ.  In addition, the chancery court awarded Renee grandparent visitation.  Bradley appeals Renee's award of grandparent visitation.

## FACTS AND PROCEDURAL HISTORY

---

[1] We use initials to protect the minor's identity.

¶2.    BJ was born in October 2015 and lived with Renee, Bradley's mother, immediately afterward.  Approximately seven months after BJ's birth, Renee petitioned for guardianship of BJ in the Rankin County Chancery Court.  Bradley and BJ's mother Samantha joined the petition, which stated that BJ had resided with Renee since birth and that it would be in BJ's best interest to remain with Renee and for guardianship to be established.  On May 20, 2016, the chancellor issued Renee letters of guardianship and ordered the appointment of Renee as BJ's guardian.  The chancellor further ordered that the parents would have "reasonable supervised visitation and contact . . . with said minor under the direction and control of Nina Renee Poole."[2]

¶3.    In 2020, Bradley petitioned for the termination of Renee's guardianship in the Rankin County Chancery Court.  Bradley pled that Renee had been unreasonably keeping him from visiting BJ in violation of the order appointing Renee as guardian.  Bradley alleged he had not consented to this order, and that he had not been advised to seek legal counsel before the judgment order was entered.  Bradley swore by affidavit:

> [I] believed that, by signing the Petition, [I] would be able to freely see [BJ].
> [I] believed that the Guardian, [my] mother, would actually afford [me] reasonable visitation with [BJ]. [I] was wrong.

Bradley asserted he was now capable of providing for BJ.  Consequently, Bradley requested the chancery court grant him sole custody of BJ and establish a custodial arrangement that would assist BJ with the transition of custody.

---

[2] Portions of this statement were handwritten.

2

¶4. Renee had initially filed the petition for guardianship in the Rankin County Chancery Court. When Bradley filed the petition for the termination of guardianship, however, he was then living in Lowndes County. Therefore, after filing his petition in the Rankin County Chancery Court as required, Bradley moved to transfer the proceedings to the Lowndes County Chancery Court. The chancellor ordered the transfer of venue because all the parties (BJ, Bradley, and Renee) had since moved to Lowndes County.[3] The chancellor also dismissed Samantha from the proceedings after Bradley filed a "Suggestion of Death," depicting Samantha's untimely death occurring during the course of the litigation.

¶5. On May 1, 2021, Renee responded to Bradley's petition to terminate her guardianship, asserting that Bradley did not state a claim upon which relief could be granted. Renee only requested for the suit to "be dismissed in its entirety and that no relief be granted." On November 3, 2021, the Lowndes County Chancery Court held a hearing on the termination of guardianship.

¶6. During the hearing, Bradley testified about his previous decision to give Renee guardianship of BJ. He said that he and Samantha were not in a serious relationship and that she "had a history of bad habits." He said Samantha abused drugs, and, at one time, another child of hers was "taken away from her because she had a gun in the car and had done shot

---

[3] Mississippi Rule of Civil Procedure 82 discusses all the circumstances upon which venue may be changed, and the doctrine of forum non conveniens is one of them. Rule 82(e) states that when an action was appropriately filed or where the venue is not specified by statute, as a matter of convenience and in the interest of justice, "the court may . . . transfer any action or any claim in any civil action to any court in which the action might have been properly filed and the case shall proceed as though originally filed therein." M.R.C.P. 82(e).

himself and stuff." He did not want something similar to happen to BJ. He wanted "to keep [BJ] safe" and "still be in her life." Bradley also testified Renee was not providing him with visitation. According to Bradley, Renee stated she would not allow BJ to visit him because Bradley lived near his father, who she claimed was a drunkard BJ should not be around.

¶7. Sometime later, Bradley moved to Clay County, Mississippi. There, he met and married Kayla Davis. He later paid for Renee to relocate to Columbus so that he could be closer to BJ. Bradley said he could visit BJ "at least once a week" because Clay County was "across the river" from Columbus, which is in Lowndes County.

¶8. Then, Bradley moved from Clay County to Lowndes County and began living on the same street as BJ. Bradley testified Renee did not allow him to visit BJ because she believed his wife was a bad person. Renee allowed him to visit BJ only if he was in the front yard or in his truck. He also said that since "no one would answer the phone" during COVID-19, he was not able to communicate with BJ for three to four months.

¶9. Bradley said he initially agreed to the guardianship when BJ was born because he had just started his "Poole Trucking" business, but since then, his circumstances changed. He testified to having employees who drove his trucks on his behalf. He said he could regularly complete his workday by noon. Bradley testified he never intended to abandon BJ. He testified that there was a time when he took care of them financially and paid Renee's rent and cell phone bill until his attorney advised him not to do so.

¶10. Bradley's attorney asked Bradley a hypothetical question about Renee's visitation.

4

Bradley's attorney asked Bradley to assume that the court awarded him custody, and if that were true, was he "willing to allow [his] mom visitation." Bradley stated, "I would like every - - at least every other weekend. But, I mean, if the Court needs to set something, I - - I don't really know." Bradley's attorney responded, "For your mom, now, is who I'm talking about." Bradley said, "Yes, ma'am. . . . And, you know, if you want to go during the week when she didn't have school - - I mean, we live right there, too. It's complicated. She would be able to go to grandmama's and come home, vice-versa."

¶11. Bradley's younger sister Polly testified that Bradley had a "horrible temper." She said that Bradley has yelled and thrown physical objects toward her in the past. But Polly testified that she had never seen Bradley have any physical altercations in BJ's presence. Polly then testified that on more than one occasion she drove him to what "[she] would call a drug deal to get pills, and [she] would witness him taken them." However, Polly could not testify to what pills Bradley allegedly took or why he took them. She also testified that she had heard Bradley "threaten to kill himself if he wanted Renee to give him some pills." Polly concluded that it was in BJ's best interest to continue living with Renee and have set visitation with Bradley. In her view, it was not best for BJ to live with Bradley "because of his pill use and his temper."

¶12. Betty Leigh Johnson, also Bradley's sister, testified as well. Betty explained that Bradley had a temper. She said that "if [BJ] did not go with him, he would cuss." Sometimes Bradley would "us[e] the F word" and say that "we were crazy, we wasn't doing

he no good," and then BJ would cry.

¶13. On January 6, 2022, the chancellor ruled that Bradley was a suitable parent, finding Bradley's anger issues understandable because he had not been allowed to see his child. The chancellor also found that the drug-use allegations were unsubstantiated because there was no testimony regarding Bradley's alleged drug use after 2019. Therefore, the chancellor terminated Renee's guardianship and granted Bradley legal and physical custody of BJ. As a transitional custodial arrangement, the chancellor ordered BJ to "reside with Renee until such time as school recesses for Christmas vacation." In the meantime, Bradley was awarded visitation on alternating weekends. When the school recessed for Christmas vacation, BJ would begin to reside with Bradley permanently.

¶14. In addition, the chancellor granted Renee visitation. Beginning on January 12, 2022, Renee would have visitation with BJ on Wednesdays from the end of the school day until the morning of the following Thursday when school began (but until 4:00 p.m. on Thursday if the school was closed). Beginning on January 14, 2022, Renee would have BJ on alternating weekends from Friday at 6:00 p.m. to Sunday at 6:00 p.m. The chancellor also granted Renee visitation with BJ during spring break and Thanksgiving on odd-numbered years and visitation during Christmas and Summer vacation on even-numbered years. Bradley appeals the chancellor's award of grandparent visitation to Renee.

## STANDARD OF REVIEW

¶15. We "accept the findings of the chancellor unless he is manifestly wrong or there is

6

clearly an abuse of discretion." *Martin v. Coop*, 693 So. 2d 912, 915 (Miss. 1997), *abrogated in part on other grounds by Smith v. Martin*, 222 So. 3d 255, 263-64 (¶15) (Miss. 2017). "We review questions of law under a de novo standard." *Vermillion v. Perkett*, 281 So. 3d 925, 929 (¶9) (Miss. Ct. App. 2019) (citing *T.T.W. v. C.C.*, 839 So. 2d 501, 503 (¶6) (Miss. 2003)).

## DISCUSSION

¶16.    Bradley argues that the chancery court lacked jurisdiction and that Renee did not have the right to petition for visitation because she did not assert the right and did not meet the statutory prerequisites.  In addition, Bradley contends that the chancellor erred by awarding Renee visitation because the chancellor did not apply the *Martin* factors,[4] and the chancellor's award was excessive.

¶17.    Because Bradley's first two issues touch and concern the court's jurisdiction and authority to hear and award grandparent visitation, we will address these issues first.  *See Scally v. Scally*, 802 So. 2d 128, 130 (¶7) (Miss. Ct. App. 2001) (stating it was appropriate for the Court to address the issue of jurisdiction before resolving other matters).

### I.      Jurisdiction

#### A.      Subject Matter Jurisdiction

¶18.    Bradley argues that the chancellor did not have subject matter jurisdiction to award Renee grandparent visitation because Renee failed to meet the prerequisites set forth in the

---

[4] *Martin*, 693 So. 2d at 916.

Mississippi Grandparents' Visitation Act (GVA). Miss. Code Ann. § 93-16-3(2) (Rev. 2018); *see also Lott v. Alexander*, 134 So. 3d 369, 372 (¶¶8-9) (Miss. Ct. App. 2014).

¶19. In essence, Bradley argues that Renee did not have statutory standing to petition for visitation. "Standing is an aspect of subject matter jurisdiction." *Hobson v. Chase Home Fin. LLC*, 179 So. 3d 1026, 1031-32 (¶17) (Miss. 2015). "[It] is a right to relief, which goes to the existence of the cause of action." *Jourdan River Ests. v. Favre*, 278 So. 3d 1135, 1146 (¶41) (Miss. 2019) (quoting 67A C.J.S. *Parties* § 11 (2008)).

¶20. "There is no common-law right to grandparent visitation." *Aydelott v. Quartaro*, 124 So. 3d 97, 100 (¶9) (Miss. Ct. App. 2013); *Settle v. Galloway*, 682 So. 2d 1032, 1035 (Miss. 1996); *Sims v. Sims*, 337 So. 3d 1085, 1095 (¶44) (Miss. Ct. App. 2021). "Such a right must come from a legislative enactment." *Settle*, 682 So. 2d at 1035; *see Sims*, 337 So. 3d at 1094 (¶39); *Aydelott*, 124 So. 3d at 100 (¶9). The right to grandparent visitation is "purely statutory" and may be allowed "only . . . if the statutory criteria are met." *Aydelott*, 124 So. 3d at 100 (¶9). "[N]either the chancellor nor this Court has the authority to rewrite the grandparent visitation statute or carve out exceptions to the mandatory requirements of the statute." *Sims*, 337 So. 3d at 1097 (¶50); *Lott*, 134 So. 3d at 370 (¶1). "[T]his Court [also] lacks authority to add words or meaning to a statute that is plain on its face." *Lott*, 134 So. 3d at 374 (¶16). Whether a grandparent may petition for grandparent visitation under the GVA is a question of standing. *Howell v. Rogers*, 551 So. 2d 904, 905 (Miss. 1989) ("The Grandparents' Visitation Rights Statutes . . . must be examined to determine whether . . . the

grandparents have standing to seek visitation . . . ."); *Conerly v. Davis*, 46 So. 3d 858, 860 (¶7) (Miss. Ct. App. 2010); *see Sims*, 337 So. 3d at 1087 n.1; *Keasler v. Fowler*, 308 So. 3d 441, 442 (¶2) (Miss. Ct. App. 2020); *Lott*, 134 So. 3d at 370 (¶1); *see also Vinson v. Vidal*, 28 So. 3d 614, 616 (¶6) (Miss. Ct. App. 2009).

¶21.    We begin our analysis with a review of the statute.  Section 93-16-3 of the GVA provides the statutory framework by which a grandparent may petition for visitation rights. Subsection (1) states:

> (1) Whenever a court of this state enters a decree or order awarding custody of a minor child to one (1) of the parents of the child or terminating the parental rights of one (1) of the parents of a minor child, or whenever one (1) of the parents of a minor child dies, either parent of the child's parents who may petition the court in which the decree or order was rendered or, in the case of the death of a parent, petition the chancery court in the county in which the child resides, and seek visitation rights with the child

Miss. Code Ann. § 93-16-3(1).  Subsection (2), on the other hand, provides:

> (2) Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds: (a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and (b) That visitation rights of the grandparent with the child would be in the best interests of the child.

Miss. Code Ann. § 93-16-3(2).

¶22.    After a review of the record, we find that Renee met the statutory prerequisites of subsection (1) of section 93-16-3. *See Solomon v. Robertson*, 980 So. 2d 319, 322 (¶6) (Miss.

9

Ct. App. 2008) ("[A] chancellor needs only address section 93-16-3(2) and (3) if section 93-16-3(1) does not apply."). In *Solomon*, after the mother was awarded custody, the paternal grandmother petitioned for grandparent visitation. *Id*. at 320 (¶1). This Court held that section 93-16-3(1) (Rev. 2004) applied because the father did not have custody. *Id*. at 322 (¶6).

¶23. Here, BJ's parents originally consented to Renee's appointment as BJ's guardian. As guardian, Renee was a "legally recognized custodian of the person or property of another with prescribed fiduciary duties and responsibilities under court authority and direction." *Harvey v. Meador*, 459 So. 2d 288, 291 (Miss. 1984). But upon terminating Renee's guardianship, the chancellor likewise awarded Bradley legal and physical custody of BJ.

¶24. Again, subsection (1) states that "[w]henever a court of this state enters a decree or order awarding custody of a minor child to one (1) of the parents of the child . . . or whenever one (1) of the parents of a minor child dies, either parent of the child's parents may petition the court in which the decree or order was rendered . . . ." Miss. Code Ann. § 93-16-3(1) (Rev. 2018). Reading the plain and unambiguous language of the statute, we conclude that subsection (1) permits either of the child's grandparents to petition for visitation when one of the parents has been awarded custody. Once the chancellor awarded Bradley sole custody, as Samantha was no longer living, the statutory requirements of subsection (1) had been met and permitted Renee to request grandparent visitation. Thus, the chancellor did not err as a matter of law by hearing Renee's petition for visitation. Because we conclude that Renee

10

met the prerequisites in subsection (1), we decline to address Bradley's claim that Renee failed to prove that she met the requirements of subsection (2).

## B. Personal Jurisdiction

¶25. Bradley also argues that because Renee failed to raise the issue of grandparent visitation in her answer, he was deprived of proper notice to adjudicate the issue. Simply put, Bradley claims that the chancery court lacked personal jurisdiction. *See Lexington Ins. v. Buckley*, 925 So. 2d 859, 865 (¶25) (Miss. Ct. App. 2005) ("The existence of personal jurisdiction . . . depends upon the presence of reasonable notice to the defendant that an action has been brought.").

¶26. Pursuant to Rule 15(b) of the Mississippi Rules of Civil Procedure, "[w]hen issues not raised by the pleadings are tried by expressed or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Once a party expressly or impliedly consents at trial to issues not in the pleadings, the party may waive his or her "due process right to reasonable advance notice and the opportunity to be heard." *Queen v. Queen*, 551 So. 2d 197, 200 (Miss. 1989). "If a party has fair notice that a new issue is being litigated and yet fails to object, then the trial court does not abuse its discretion by addressing the issue." *Ward v. Est. of Cook*, 294 So. 3d 1252, 1258 (¶15) (Miss. Ct. App. 2020); *Johnson v. Smith*, 328 So. 3d 145, 154 (¶39) (Miss. Ct. App. 2021); *Shipley v. Ferguson*, 638 So. 2d 1295, 1300 (Miss. 1994).

¶27. In this case, Renee only requested the court deny Bradley's petition for the termination

11

of her guardianship. But after hearing testimony from both parties, the chancellor asked Bradley and Renee if each of them consented to the amendment of the pleadings, to which Bradley agreed:

> COURT: I will say this to y'all; that - Ms. Smith, all that was pled was a general denial in this case. However, if you want to file for grandparent visitation, I will hear it on December the 7th or 8th, right here in the courtroom. Or if y'all want to be civil about it, y'all can both agree on the record, allowing Ms. Donna - Ms. Connie Smith[5] to waive any right she might have for appeal, I can establish grandparent visitation right now so we don't have to spend more money, we don't have to come back; and that would take Ms. Donna Smith stating that although there was not a petition filed, that she believes, as an office of this court, that the prerequisites necessary that I would have to look at in the [*Martin*] case would be met . . . .
>
> DONNA: Your Honor, we are in agreement that she should have visitation.
>
> COURT: All right. Ms. Connie Smith, do you want me to establish grandparent visitation right now, understanding that I'm not - you're not waiving any right you have to appeal my ruling?
>
> CONNIE: Absolutely, Judge.

¶28. Given that Bradley consented to the amendment of Renee's pleadings, we conclude that the chancery court obtained personal jurisdiction over Bradley to address this issue. Bradley was given fair notice and an opportunity to be heard. The chancellor gave Bradley an opportunity to object and thereby forced Renee to file a petition for visitation, which would be heard at a later date. But after conferring with his attorney, Bradley chose not to

---

[5] Donna Smith was trial counsel for Bradley Poole. Connie Smith was trial counsel for Renee Poole.

do so—on the record and under oath. Thus, in accordance with Rule 15(b) and *Shipley*, Renee's pleadings were properly amended because Bradley had fair notice of the new issue being litigated and failed to object. *See* M.R.C.P. 15(b); *Shipley*, 638 So. 2d at 1300. Thus, Bradley has waived the lack-of-notice argument.

## II. Grandparent Visitation

¶29. The law regarding grandparents' visitation rights under the GVA is still evolving. *See generally Smith v. Wilson*, 90 So. 3d 51, 56 (¶¶13-20) (Miss. 2012) (discussing the constitutionality of the grandparent visitation statutes); *Garner v. Garner*, 283 So. 3d 120, 140 (¶86) (Miss. 2019) (interpreting the grandparent visitation rights act as not applying to step-grandparents). In 1997, our supreme court developed the *Martin* factors for the chancellor to consider when determining the amount of grandparent visitation to award.[6]

---

[6] The ten *Martin* factors follow:

1. The amount of disruption that extensive visitation will have on the child's life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time; 2. The suitability of the grandparents' home with respect to the amount of supervision received by the child; 3. The age of the child; 4. The age, and physical and mental health of the grandparents; 5. The emotional ties between the grandparents and the grandchild; 6. The moral fitness of the grandparents; 7. The distance of the grandparents' home from the child's home; 8. Any undermining of the parent's general discipline of the child; 9. Employment of the grandparents and the responsibilities associated with that employment; [and] 10. The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent's manner of child rearing is not to be interfered with by the grandparents.

*Martin*, 693 So. 2d at 916.

13

*Martin*, 693 So. 2d at 916. In 2017, however, the Court clarified that the *Martin* factors must be considered for a chancellor to determine whether grandparent visitation should be awarded in the first place. *Smith*, 222 So. 3d at 263 (¶15). Thus, despite our evolving law, what remains clear is that after the chancellor finds that the grandparent has met the statutory prerequisites to seek grandparent visitation, the chancellor must then determine whether awarding visitation is in the best interest of the child, and, if so, "the amount of visitation that grandparents should be granted." *Arrington v. Thrash*, 122 So. 3d 144, 149 (¶¶18-19) (Miss. Ct. App. 2013); *Martin*, 693 So. 2d at 915.

¶30. Our supreme court has explained the paramount consideration in a child custody and visitation matter remains, and always is, the best interest of the child. *Smith*, 222 So. 3d at 263 (¶15); *Martin*, 693 So. 2d at 915; Miss. Code Ann. § 93-16-5 ("[T]he court may, in its discretion, if it finds that such visitation rights would be in the best interest of the child, grant to a grandparent reasonable visitation rights with the child."). And there is a "traditional presumption that a fit parent will act in the best interest of his or her child." *Smith*, 90 So. 3d at 56 (¶17).

¶31. This Court reviews the chancellor's decision to grant grandparent visitation and the amount of grandparent visitation awarded under the abuse-of-discretion standard. *Martin*, 693 So. 2d at 915; *Smith*, 222 So. 3d at 259 (¶4). "We are 'bound to accept the findings of the chancellor unless he is manifestly wrong or there is clearly an abuse of discretion.'" *Arrington*, 122 So. 3d at 148 (¶13) (quoting *Martin*, 693 So. 2d at 915).

14

## A. Award of Grandparent Visitation

¶32. Bradley argues that the chancellor erred by awarding grandparent visitation to Renee because the chancellor failed to analyze the *Martin* factors to determine if visitation was in BJ's best interest. We disagree because Bradley consented to the award of visitation.

¶33. In a child custody case stemming from a divorce between the child's parents, our supreme court addressed whether the chancellor's award of physical and legal custody of the minor child to the father was in the best interest of the child. *Rushing v. Rushing*, 724 So. 2d 911, 916 (¶24) (Miss. 1998). In *Rushing*, the child's mother, Mrs. Rushing, argued that the chancellor's grant of sole legal and physical custody of the child to Mr. Rushing was in error because the court "failed to refer to the factors enunciated by th[e] Court in *Moak v. Moak*, 631 So. 2d 196[, 198] (Miss. 1994),[7] when determining the custody issue." *Rushing*, 724 So. 2d at 916 (¶26). Our supreme court held that the chancellor did not err because "Mrs. Rushing conceded the issue of child custody in open court" and then "entered an *agreed* consent judgment granting custody of the minor child to Mr. Rushing . . . ." *Id*. at 916 (¶25). Therefore, our supreme court held that "the chancellor was not required to issue specific findings of fact nor was he required to determine the issue of child custody." *Id*.

¶34. We see no reason to treat consent in open court any differently. Bradley first conceded to the establishment of grandparent visitation during the hearing on the petition to terminate the guardianship. Bradley testified that he would agree to Renee receiving

---

[7] The factors discussed in *Moak* are the *Albright* factors. *Moak*, 631 So. 2d at 198 (citing *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983)).

visitation:

> BRADLEY: I would like every - - at least every other weekend. But, I mean, if the Court needs to set something, I - - I don't really know.
>
> DONNA: For your mom, now, is who I'm talking about.
>
> BRADLEY: Yes, ma'am.

Later, the chancellor terminated the guardianship after finding Bradley to be a fit parent.

Then, Bradley conceded to the establishment of grandparent visitation once more:

> COURT: [I]f you want to file for grandparent visitation, I will hear it on December the 7th or 8th, right here in the courtroom. Or if y'all want to be civil about it, y'all can both agree on the record[.] . . . You know what the [*Martin*] case is, and so I will let y'all talk to your clients about that, and y'all let me know if y'all want me to come back and award grandparent visitation. If not, notify my court - - staff attorney that you do not. And, Ms. Donna Smith, you're to prepare the order based on these findings. . . .
>
> DONNA: Your Honor, we are in agreement that she should have visitation.

¶35. Under these circumstances, we conclude that Bradley's consent abated the need for the chancellor to consider the *Martin* factors. The chancellor was allowed to presume that when Bradley, the natural and fit parent, agreed to the award of the grandparent visitation in open court, he was acting in the best interest of BJ. *See Smith*, 90 So. 3d at 56 (¶17). We find, as our supreme court did in *Rushing*, that the chancellor did not err by granting Renee visitation without first making specific findings of fact on the *Martin* factors because Bradley conceded the issue in open court. *See Rushing*, 724 So. 2d at 916 (¶25). This issue is without

merit.

### B.     Excessive Grandparent Visitation

¶36.    Bradley further argues that the amount of grandparent visitation awarded to Renee was excessive.  Thus, the question is whether the chancellor "exceeded his discretion by awarding liberal visitation similar to what would be customarily awarded to a parent." *Arrington*, 122 So. 3d at 149 (¶20).

¶37.    We find that Bradley has waived this issue because he failed to raise it before the chancellor and instead raises it for the first time on appeal. *Hoffman v. Hoffman*, 270 So. 3d 1121, 1128 (¶32) (Miss. Ct. App. 2018).  An appellant's "failure to make a proper objection waives any claim of error on appeal." *Carter v. Carter*, 204 So. 3d 747, 754 (¶31) (Miss. 2016).  Waiver notwithstanding, we also find that because Bradley orally agreed in open court to the amount of visitation awarded to Renee and then later memorialized the agreement by his attorney's signature, Bradley's argument still fails. *Cf. Samples v. Davis*, 904 So. 2d 1061, 1064 (¶10) (Miss. 2004).

¶38.    When discussing the amount to be awarded the chancellor stated:

> COURT:     [W]e're going to start this as [Bradley] said, and we're going to start this - - it's going to be every other weekend, [Bradley], until Christmastime; then the week before Christmas, it will be - - [Bradley] will be able to have visitation with [BJ] up until 12:00 o'clock on Christmas Day, and then [Renee] will be able to have visitation from 12 o'clock until school starts. Okay. And, [Renee], after that, we will go back to a visitation schedule where [Bradley] will have visitation - - will have the physical custody of [BJ] at that time. [Renee] will have visitation every other weekend and every Wednesday during the week. And then

17

> after that, she will have two weeks in the summer. If y'all can't otherwise agree, the[n] [it] will be the second week in June and the second week in July, from 6:00 p.m. to 6:00 p.m. 6:00 p.m. on Friday to 6:00 p.m. on - - all of the visitations will start at 6:00 p.m. on Friday to 6:00 p.m. on Sunday on the weekend visitations. Now, I'm not allowed to give more grandparent visitation. I'm limited in what I can do, but I would like to see the holidays split for Thanksgiving. I'm going to - - I'm going to order the standard Farese[8] visitation after that. And, Ms. Donna Smith, if you want to appeal my ruling on that, you certainly can, but I want it to be - - I want it to be standard Farese visitation, okay?

> DONNA: On Christmas?

> COURT: Going forward, on the holidays.

> DONNA: Okay.

> COURT: Okay?

> DONNA: Um-hmm. (Yes)

¶39. Next, the chancellor commended Renee for taking care of BJ: "Most grandparents don't - - won't step up and do what you did. You turned your whole life over for this child, and don't think that I don't know that and I don't realize that . . . . Through no creation of your own, you stepped up when you didn't have to." Later, the chancellor said:

> COURT: . . . I do find that all of this that I'm ruling on today is in the best interest of [BJ], and I find it by clear and convincing evidence.

---

[8] According to *Hamilton v. Hamilton*, 755 So. 2d 528, 530 n.1 (Miss. Ct. App. 1999), "[t]he Farese Visitation Schedule is a model originating from chancery districts in north Mississippi. While the schedule has been referred to [in] Mississippi case law, chancellors are vested with the authority to use their discretion in regard to the circumstances of the parties and the nature of the case in fashioning visitation schedules." (citations omitted).

18

Is there any questions based on what I have said?

DONNA: One question, Your Honor.

COURT: Okay.

DONNA: It has been my practice - - the Court may choose, obviously, not to do this. I prefer that Christmas visitation start a little bit later so the child can eat where they've been smelling that food.

COURT: I just said 12:00 o'clock. I don't care. It doesn't matter to me.

¶40. As the record shows, Bradley orally agreed to the amount of visitation and did not object at any point to the terms beyond asking when Christmas visitation started. Moreover, Bradley's attorney drafted and signed the termination of guardianship order, including the amount of grandparent visitation awarded to Renee, which the chancellor then entered as the final judgment. *See Samples*, 904 So. 2d at 1065 (¶14); *accord McDonald v. McDonald*, 850 So. 2d 1182, 1189 (¶25) (Miss. Ct. App. 2002). Here, the record is clear that Bradley consented to the amount of grandparent visitation awarded because the amount of visitation was announced in court, Bradley's attorney agreed to the amount of visitation, and afterward Bradley's attorney drafted and signed an order memorializing the visitation.[9]

_____

[9] The dissenting opinion spends a great deal of time demonstrating that Bradley did not agree to the amount of the grandparent visitation awarded by opining that (1) the final judgment was not a consent judgment, and (2) Bradley's trial testimony agreeing to Renee having visitation every other week is less than the amount of visitation the chancellor actually awarded. As a third point, the dissent opines that Bradley did not waive the issue by failing to object. However, we do not conclude that the final judgment was an agreed judgment or the product of consent. The fact that Bradley drafted the order detailing the visitation amount awarded (without an objection and without filing a post-trial motion) bolsters the fact that Bradley waived the issue. Nor do we rely on Bradley's testimony at trial as evidence that Bradley agreed to the amount of the visitation awarded. His trial testimony merely indicates

19

¶41. To be clear, what waives this argument on appeal is Bradley's failure to object after the chancellor read the terms of the visitation aloud. Again, in response to the terms, Bradley's attorney asked, "On Christmas?" Notably, the dissent leaves out the terms announced in court and the question Bradley's attorney asked. Further, the dissent characterizes this question as a "clarifying one." Regardless, the point is that this was the only concern raised and that Bradley did not contest the amount of visitation awarded, which he was free to do.

¶42. It is a well-settled principle that the failure to make a contemporaneous objection in the trial court procedurally bars the argument on appeal. *Powell v. Powell*, 976 So. 2d 358, 363 (¶20) (Miss. Ct. App. 2008); *McCullough v. McCullough*, 52 So. 3d 373, 379 (¶25) (Miss. Ct. App. 2009) (citing *Dorrough v. Wilkes*, 817 So. 2d 567, 577 (¶33) (Miss. 2002)).

¶43. In any event, Bradley's argument still fails. "[I]t is clear to this Court that visitation granted to grandparents should not be equivalent to that which would be granted to a non-custodial parent unless the circumstances overwhelmingly dictate that it should be." *Martin*, 693 So. 2d at 916; *Settle*, 682 So. 2d at 1035. These circumstances "must be fully discussed on the record." *Townes v. Manyfield*, 883 So. 2d 93, 97 (¶29) (Miss. 2004); *Bolivar v. Waltman*, 194 So. 3d 889, 896 (¶23) (Miss. Ct. App. 2016).

¶44. We acknowledge that the chancellor did not make detailed findings in his order for awarding Renee visitation equal to that of a non-custodial parent. However, in the interest

---

that he agreed to the establishment of the visitation.

of judicial economy, we do not reverse for the chancellor to modify his order, but we take these exceptional circumstances into consideration. *See Cooley v. Stevens*, 240 Miss. 581, 592, 128 So. 2d 124, 128 (1961) ("The law does not require one to do a vain and useless thing.") (quoting *McLain v. Meletio*, 166 Miss. 1, 147 So. 878, 879 (1933)).

¶45.   The record sufficiently demonstrates an exceptional set of circumstances supporting the amount of visitation the chancellor awarded Renee.  The uncontroverted evidence depicted that Renee had a strong bond with BJ due to her having been BJ's primary caregiver since she was two weeks old.  Less than a year later, BJ's biological parents, Samantha and Bradley, agreed to appoint Renee as BJ's guardian because Bradley was not in a financially stable position and Samantha had a history of drug abuse.  From then on, Renee had physical custody of BJ and the legal right to make decisions on behalf of BJ.  Sometime later, Renee moved her family from Rankin County to Lowndes County, where Bradley lived, so that BJ could be closer to him.  Thereafter, Bradley moved as well.  He then lived on the same street as Renee.  After Bradley petitioned for the termination of Renee's guardianship, BJ's mother passed away.  And until that time, BJ had spent her entire existence in Renee's custody. Thus, we find that the record supports the amount of visitation awarded.  We hold that the chancellor did not abuse his discretion and affirm the amount of visitation awarded.

## CONCLUSION

¶46.   The chancery court had jurisdiction.  And because Renee met the prerequisites of the GVA, Renee had the right to petition for grandparent visitation.  Because Bradley consented,

Renee's request for grandparent visitation was proper. Bradley failed to object to the amount of visitation awarded and, therefore, waived the issue of whether the grandparent visitation was excessive. Thus, we affirm the award of grandparent visitation.

¶47. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., McDONALD AND LAWRENCE, JJ., CONCUR. EMFINGER, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, McCARTY AND SMITH, JJ.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶48. I concur in part and dissent in part. I agree that the chancery court had jurisdiction to consider Renee's request for grandparent visitation and that the issue was tried by consent. However, Bradley did not agree to the amount of visitation awarded to Renee, nor did he waive the issue. In addition, the chancellor did not support the visitation award—which grants Renee more visitation than is typically awarded to a non-custodial parent—with any findings regarding the *Martin* factors.[10] For that reason, the decision must be reversed and the case remanded for further proceedings regarding the award of grandparent visitation.[11]

¶49. The plurality opinion states that Bradley "agreed" to the amount of visitation awarded to Renee or "waived" the issue for three basic reasons. *First*, Bradley testified as follows:

---

[10] *Martin v. Coop*, 693 So. 2d 912, 916 (Miss. 1997), *abrogated in part on other grounds by Smith v. Martin*, 222 So. 3d 255, 263-64 (¶15) (Miss. 2017).

[11] *See, e.g.*, *Townes v. Manyfield*, 883 So. 2d 93, 97 (¶29) (Miss. 2004); *Bolivar v. Waltman*, 85 So. 3d 335, 339 (¶¶10-13) (Miss. Ct. App. 2012).

Q.     And you said you're willing to allow your mom visitation. What sort of visitation? Do you want that to be at your discretion or do you want the Court to set something?

A.     I mean, I would like . . . at least every other weekend. But, I mean, if the Court needs to set something, . . . I don't really know.

. . . .

. . . I mean, I would like every other weekend. And, you know, if you want to go during the week when she didn't have school -- I mean, we live right there, too. It's complicated. She would be able to go to grandmama's and come home, vice-versa.

¶50.   *Second*, after the chancellor announced his ruling terminating the guardianship, the chancellor and Bradley's attorney, Donna Smith, discussed the issue of grandparent visitation as follows:

THE COURT:     . . . [A]ll that [Renee] pled was a general denial in this case. However, if you want to file for grandparent visitation, I will hear it on December the 7th or 8th, right here in the courtroom. Or if y'all want to be civil about it, y'all can both agree on the record, . . . I can establish grandparent visitation right now so we don't have to spend more money, we don't have to come back; and that would take Ms. Donna Smith stating that although there was not a petition filed, that she believes, as an officer of this court, that the prerequisites necessary that I would have to look at it in the [*Martin*] case would be met, because you've heard the same testimony that I'm going to hear. You know what the [*Martin*] case is, and so I will let y'all talk to your clients about that, and y'all let me know if y'all want me to come back and award grandparent visitation. If not, notify my court -- staff attorney that you do not. And, Ms. Donna Smith, you're to prepare the order based on these findings. . . .

DONNA SMITH:   Your Honor, we are in agreement that she should have

23

visitation.

The chancellor then announced a visitation schedule, and Bradley's attorney asked one clarifying question about the schedule without stating an objection to it.

¶51. *Third*, after the hearing, "Bradley's attorney drafted and signed an order memorializing the visitation." *Ante* at ¶40. That proposed order incorporated the chancellor's findings, terminated the guardianship, awarded Bradley legal and physical custody of BJ, and awarded Renee visitation. Bradley's attorney signed the proposed order indicating that Bradley "AGREED AS TO FORM."

¶52. I will address these three points in reverse order. Bradley did not waive any issues when his attorney signed the proposed judgment as "AGREED AS TO FORM." "[A] party's approval of an order as to form is not consent to the substance of the order." *In re Cauley*, 437 S.W.3d 650, 658 (Tex. App. 2014). "One who approves a judgment as to form does not thereby give up the right to appeal. He simply indicates that the written judgment accurately sets forth the court's ruling; he may disagree with that ruling and may want to appeal it." *Bexar Cnty. Crim. Dist. Attorney's Off. v. Mayo*, 773 S.W.2d 642, 644 (Tex. App. 1989) (citation omitted). This Court recognized this point in *Klein v. McIntyre*, 966 So. 2d 1252, 1256-57 (¶15) (Miss. Ct. App. 2007), holding that an order signed by counsel as "Approved as to Form Only" was not a consent judgment. And in *Beck v. Goodwin*, 456 So. 2d 758, 759-60 (Miss. 1984), our Supreme Court held that an "agreed order" that is "approved as to

24

form only" does not waive issues for appeal.[12] Thus, Bradley did not waive any issue or agree to the substance of the judgment by indicating that he "AGREED AS TO FORM." His attorney was simply complying with the chancellor's instruction to prepare a judgment "based on [the chancellor's] findings." *Supra* ¶50.

¶53. Nor did Bradley agree to the amount of visitation or waive the issue by not objecting to the chancellor's bench ruling in open court. A bench ruling or "oral pronouncement" by the court is not a final or effective judgment. *Banks v. Banks*, 511 So. 2d 933, 935 (Miss. 1987). "[E]very decree is in the breast of the court until entered and a decree has no validity until written out and signed by the chancellor." *Id.* at 934 (quoting *Orr v. Myers*, 223 Miss. 856, 862, 79 So. 2d 277, 278 (1955)). Although the chancellor announced his ruling from the bench, he just as easily could have taken the issue of visitation under advisement and issued only a written decision later. There is no rule requiring a party to make on-the-fly objections when a chancellor chooses to announce a non-binding, non-final ruling from the bench. Bradley properly filed a notice of appeal from the final written judgment.[13]

---

[12] *See also Patrick v. Patrick*, 204 So. 3d 854, 858 (¶13) (Miss. Ct. App. 2016) (emphasizing the difference between an attorney's approval "as to content and as to form," which showed that his client "approved and consented to both the form of the consent order *and its substance*," and an approval "as to form" only); Administrative Procedures for Mississippi Electronic Courts § 4(C)(2)(a) ("In the case of a proposed order to bear the signature of two or more attorneys, . . . [t]he drafting attorney shall initially confirm that all persons required to sign the proposed order have reviewed it and that it is acceptable as presented (e.g., *agreed as to form only or as to form and substance*)." (emphasis added)).

[13] Nor was Bradley required to file a post-judgment motion. "[A] party is not required to file a post-trial motion in chancery court in order to appeal the chancery court's judgment." *Aspired Custom Homes LLC v. Melton*, 72 So. 3d 540, 544 (¶11) (Miss. Ct. App. 2011).

25

¶54.    Finally, Bradley did not agree to the amount of court-ordered visitation during his testimony at trial. As quoted above, Bradley was asked generally "[w]hat sort of visitation" he thought Renee should have and whether he wanted visitation "to be at [his] discretion" or court-ordered. In response, Bradley stated that he "would like every other weekend" and that BJ could also visit Renee "during the week when she didn't have school." But Bradley also expressed uncertainty and stated that the issue was "complicated." In the final judgment, the chancellor granted Renee not only alternating weekends from 6 p.m. on Friday to 6 p.m. on Sunday but also overnight visitation every Wednesday all year, all of spring break during odd-numbered years, half of Thanksgiving break each year, half of Christmas vacation each year, and two full weeks during summer vacation. All told, the chancellor granted Renee visitation covering about 120 days/nights per year. This far exceeds the simple "every other weekend" Bradley suggested in his testimony.

¶55.    Turning to the merits of this issue, the chancellor erred by granting Renee such extensive visitation rights without making any findings regarding the *Martin* factors. "The Mississippi Supreme Court has explained that 'making findings of fact under the *Martin* factors is an integral part of a determination of what is in the best interest of a child.'" *Bolivar*, 85 So. 3d at 339 (¶10) (quoting *Townes*, 883 So. 2d at 97 (¶29)). "Because of the 'integral' nature of these findings, our [S]upreme [C]ourt specifically instructs that 'the *Martin* factors are to be applied and discussed *in every case* in which grandparent visitation is an issue.'" *Id.* (quoting *Townes*, 883 So. 2d at 97 (¶29)). In addition, "[t]he visitation

26

granted to a grandparent should be less than that which would be awarded to a non-custodial parent, unless the circumstances overwhelming[ly] dictate that that amount of visitation is in the best interest of the child, and it would be harmful to the child not to grant it." *Townes*, 883 So. 2d at 96 (¶21) (brackets omitted) (quoting *Martin*, 693 So. 2d at 916). "[W]hen a chancellor finds that there are circumstances that 'overwhelmingly dictate' that a grandparent should be awarded equivalent visitation to that of a parent, those findings must be fully discussed on the record." *Id.* at 97 (¶29).

¶56.    Here, the chancellor awarded Renee visitation of about 120 days/nights per year, which exceeds what is normally awarded to a parent. The chancellor stated that he would "order the standard Farese visitation,"[14] but he actually awarded Renee more than that because standard Farese visitation does not include weekly overnight visitation on a weekday. By comparison, the chancellor in *Martin* stated that he was awarding the grandparents visitation under the "Farese Visitation Schedule," which amounted to 86 days per year in even years and 81 days per year in odd years. *Martin*, 693 So. 2d at 914-15.[15] Here, the chancellor granted Renee even greater visitation but made no findings of fact regarding the *Martin* factors. The complete absence of findings would require reversal in any

---

[14] *See Hamilton v. Hamilton*, 755 So. 2d 528, 530 n.1 (Miss. Ct. App. 1999) ("The Farese Visitation Schedule is a model originating from chancery districts in north Mississippi.").

[15] This Court has stated that standard "liberal visitation" for a non-custodial parent would include, at minimum, two weekends a month during the school year and five weeks in the summer. *Chalk v. Lentz*, 744 So. 2d 789, 792 (¶9) (Miss. Ct. App. 1999) (citing *Crowson v. Moseley*, 480 So. 2d 1150, 1153 (Miss. 1985)).

case. Given that the chancellor awarded more visitation than is often awarded to a parent, it is even clearer that we must reverse. *Townes*, 883 So. 2d at 97 (¶29); *Bolivar*, 85 So. 3d at 339 (¶¶10-13).

¶57. In summary, Mississippi Supreme Court precedent requires us to reverse and remand the case for further proceedings because the chancellor granted extensive grandparent visitation without making any findings regarding the *Martin* factors. Accordingly, I respectfully dissent in part.[16]

**GREENLEE, McCARTY AND SMITH, JJ., JOIN THIS OPINION.**

---

[16] Although Bradley's attorney clearly agreed on the record that Renee "should have visitation," I doubt that even this clear statement can completely foreclose appellate review of the issue. Even an express "agreement between the parties affecting [child] custody . . . must have the approval of the court." *Reno v. Reno*, 253 Miss. 465, 474, 176 So. 2d 58, 62 (1965). In any event, for the reasons stated above, the case should be reversed and remanded for further proceedings regarding visitation and for the chancellor to make the findings of fact necessary to support an award of grandparent visitation. On remand, "the chancellor should consider [BJ's] circumstances at the time of the remand hearing . . . ." *Vaughn v. Davis*, 36 So. 3d 1261, 1267 (¶18) (Miss. 2010). "As always . . . , the best interests of the child should guide the analysis as a polestar." *Id.*